John DOBOSZ and William
LaSalata, Plaintiffs,

and

Theophilus B. Meekins, Intervening
Plaintiff,

v.

Arthur DelMONTE et al., Defendants.

Civ. No. B–81–54.

United States District Court,
D. Connecticut.

March 5, 1981.

Edward V. Barrett, Coles, O'Connell, Dolan & McDonald, P. C., Bridgeport, Conn., for Dobosz.

Beverly Hodgson, Bridgeport, Conn., for Meekins.

Raymond Rubens, Bridgeport, Conn., Thomas Bucci, Asst. City Atty., Bridgeport, Conn., for DelMonte.

## MEMORANDUM OF DECISION

DALY, District Judge.

This is an application for injunctive relief barring the Board of Police Commissioners of the City of Bridgeport from hearing charges against three police officers. Plaintiffs Dobosz and LaSalata, and intervening plaintiff Meekins[1] join in the single application, but offer different reasons for the Court to grant the injunction. Defendants resist an injunction and ask the Court to enter final judgment in their favor.

The Court hereby enjoins the Commissioners from considering charges against the officers, for the several reasons discussed below. The injunction is preliminary, and permanent relief will await further discovery and a trial of the merits.[2]

## I.

The facts established show that plaintiffs Dobosz and LaSalata and intervening plaintiff Meekins were suspended without pay from the Bridgeport police force on January 22, 1981 by a four to two vote of the Board of Police Commissioners. The previous week a similar vote had been taken, but was withdrawn and recast on January 22. The incident from which the suspensions stem occurred on September 17, 1979 when Officer Meekins arrested James Cunningham, with the assistance of Officers Dobosz and LaSalata. Cunningham filed a citizen complaint[3] pursuant to the B–111 procedure alleging that Meekins had used excessive force in the arrest. As called for by department procedure, Captain Sharnick investigated the basis for Cunningham's complaint by interviewing the complainant, other witnesses to the arrest, and the police officers involved. On January 8, 1980 Sharnick concluded that the complaint should "be ruled not sustained," because of the low credibility of Cunningham and his friends.[4] That conclusion was endorsed by Inspector Mete and Superintendent Walsh.[5]

After the department's finding that his complaint lacked merit, Cunningham, by his attorney, appealed its dismissal to the Board of Police Commissioners.[6] Superintendent Walsh arranged for Attorney Shapiro and his client to appear at an executive session of the Board.[7] At about the time of Cunningham's appeal, on dates uncertain on this record, Walsh corresponded with the State's Attorney's office about the advisability of charging Meekins in a criminal action, but State's Attorney Browne declined prosecution.[8] Shortly thereafter,

---

1. Officer Meekins' motion to intervene was granted upon consent on February 4, 1981.

2. Although the Court denies defendants' motion for consolidation under Fed.R.Civ.P. 65(a)(2), the evidence already received at the preliminary injunction hearing will not be heard again at a trial on the merits, according to the Rule.

3. Plaintiffs' Exhibit 8

4. Plaintiffs' Exhibit 6

5. Plaintiffs' Exhibit 13

6. Defendants' Exhibit 504

7. Defendants' Exhibit 505

8. Plaintiffs' Exhibit 7

Cunningham was found guilty of assaulting Officer Meekins by a state court jury.[9]

On June 24, 1980 Cunningham filed in federal district court a civil complaint against Officer Meekins, a John Doe, and the City of Bridgeport alleging both individual and municipal liability.[10] On that same day, the Commissioners began a four month series of executive session hearings to receive testimony from Cunningham and his witnesses.[11]

After the hearings were concluded, Walsh sent redacted transcripts to State's Attorney Browne,[12] advocating a reconsideration of criminal charges against Meekins. Then, at their January 13, 1981 meeting, the Commissioners retired into executive session, inviting Mayor Mandanici and Superintendent Walsh to remain, and voted, four to two, to suspend Meekins, Dobosz and LaSalata without pay. Walsh was directed to draw up charges,[13] which he did, charging Dobosz and LaSalata with violations of Rule 1,[14] and charging Meekins with violation of several rules in two unrelated incidents.[15] On January 22 the Commissioners, fearing a Freedom of Information Act violation, withdrew their earlier suspensions, and voted in public session to suspend. Walsh volunteered to prepare charges, and suggested there might be additional ones because of "many other issues that have come up since."[16] The officers were then notified of the charges: again, a violation of Rule 1 for the two white officers, and amended charges relating only to the Cunningham incident for Meekins.[17]

Contemporaneously with these events in the Cunningham matter, the police department was found to practice racial discrimination by the Connecticut Commission on Human Rights and Opportunities[18] and by the federal Office of Revenue Sharing.[19]

The instant action was commenced on February 2, 1981. This Court refrained from making a decision until after the Commissioners had the opportunity at their February 11 meeting to act upon several motions by the union to, *inter alia*, disqualify themselves or dismiss the notices of suspension for failure to comply with contract and city charter provisions.[20] During the pendency of plaintiffs' application for an injunction, defendants have refrained, by agreement, from taking any substantive action on Cunningham's charges, and have paid, by Court order, the three suspended officers their salaries and medical insurance benefits.

## II.

The reason for the Court's order to pay the officers during their suspensions was to forestall the irreparable injury they would undoubtedly suffer without income. As plaintiff LaSalata testified, a suspension without pay would result in his family going hungry. Plaintiff Dobosz, whose family is dependent on his wages, expects severe

---

9. Testimony regarding the conviction was received without objection in hearings before this Court.

10. Pursuant to Fed.R.Ev. 201, the Court takes judicial notice of the complaint in James Cunningham v. Theophilis B. Meekins, John Doe and the City of Bridgeport, Civil Action No. B-80-318.

11. Defendants' Exhibit 506(a) is a tape of those proceedings, and 506(b) is the transcript of the recording.

12. Testimony of Joseph A. Walsh.

13. Plaintiffs' Exhibit 16

14. Plaintiffs' Exhibits 11, 12

15. The Court takes judicial notice of the document attached to Meekins' application in

Bridgeport Guardians v. Arthur DelMonte, Civil Action No. B-78-175.

16. Plaintiffs' Exhibit 15

17. Plaintiffs' Exhibits, 9, 10

18. Testimony regarding the CCHRO's finding was received without objection in hearings before this Court.

19. The Court takes judicial notice of Exhibit A attached to the intervening complaint in this action.

20. Court Exhibit 1, and transcript of February 11, 1981 meeting of Board of Police Commissioners.

financial problems if he loses his income. Similarly, intervening plaintiff Meekins supports his family on his salary, and has already experienced economic hardship during his 1978–1979 suspension.

Although lost income may be compensable in damages if these plaintiffs succeed in refuting Cunningham's charges, the disruption in cash flow is likely to cause hardship which is not readily compensable. Mortgage payments unmet, a result Meekins stated was likely, could well result in foreclosure, and the loss of a family home would cause irreparable hardship. Medical insurance premiums unpaid, a consequence of an unpaid suspension, could so seriously jeopardize a family's health and financial resources as to amount to irreparable injury.

The potential hardship to these particular plaintiffs is particularly egregious because of the length of time the disruption in pay is likely to last.[21] If the Commissioners hear the charges against the plaintiffs, it is likely that bias and adversity of interest will compel them to dismiss the officers from the police force, as more fully discussed below. Obviously, unjustified dismissal will make financial hardship a long lasting condition, alleviated only by other employment. If the Commissioners do reinstate the officers, the disruption in pay and resulting hardship is not likely to be cured for at least six months. Evidence shows that the Commissioners heard testimony from Cunningham and his friends at evening meetings over a span of four months, from June through October, 1980, and then waited three months, until January 1981, to consider the evidence they had heard and to vote. With that chronology setting the measure of time the Commissioners take to act upon uncontested testimony, a prediction that the hearings now proposed will

last at least six months is entirely credible, since the officers will have attorneys, and the right to cross-examine witnesses and present evidence. Also, Superintendent Walsh testified that he plans to present at least 11 witnesses and 2,000 pages of documents in the upcoming hearings: his plan does nothing to shorten the estimated duration.

Accordingly, the Court finds that plaintiffs have met the first prong of the test for a preliminary injunction as set forth in *Caulfield v. Board of Education of City of New York*, 583 F.2d 605, 610 (2nd Cir. 1978), a showing of possible irreparable injury. The second prong, probable success on the merits, is likewise satisfied, as the following discussion of plaintiffs' substantive claims explains.

### III.

Officers Dobosz and LaSalata claim their suspensions without pay violate due process because there was no notice given of the charges, and no findings made of probable cause, before the suspensions were effected. The facts underlying their claims, determined after two days of hearings, are as follows.

As a matter of undisputed testimony, James Cunningham did not name either Officer Dobosz or LaSalata as a subject of his B–111 complaint, though he did use two question marks in the space provided for identifying the officers in question. It is also clear that neither officer was told that his conduct was being examined by Captain Sharnick during the departmental investigation triggered by the B–111 complaint. There is some dispute, though, as to whether the officers knew their conduct was under investigation by the Commissioners in

---

**21.** In defendants' memorandum of February 9, 1981 they suggest the collective bargaining agreement, Article V, Section 2, which is Defendants' Exhibit 501, be interpreted to limit an unpaid suspension to ten days. While that reading of the contract is plausible, and may be correct, defendants first raise it in their post-hearing brief. Since it was not raised at any earlier time, the Court ordered pay continued during the pendency of these proceedings, and

now further orders it until final disposition of the charges. If, after a trial on the merits, the Commissioners are permanently enjoined from considering charges against these plaintiffs, there is likely to be some lapse of time before another body hears and determines the charges, during which the officers will suffer the same sort of financial injury they will suffer if the Commissioners themselves proceed.

the second stage of the process, after Cunningham appealed to the Board of Commissioners.

Officer Dobosz testified that in September 1980 he met with Superintendent Walsh and Officer Cisko. They asked him about the Cunningham incident of the previous year, and told him he might be named as a defendant in a civil suit Cunningham had filed in federal district court. Dobosz was not told then, nor at any other time, that his conduct was under investigation, according to his recollection. Officer LaSalata gave similar testimony. He knew a civil complaint naming Meekins as a defendant had been filed by Cunningham, but he had no knowledge of John Doe allegations. LaSalata had no clue that his conduct was then being investigated by the Commissioners. Commissioner O'Leary confirmed the officers' testimony with his statement that when they appeared before the Commissioners, neither Dobosz nor LaSalata was told he was under investigation.

In stark contrast to testimony of the two officers, Superintendent Walsh stated that both knew they were under investigation by the Commissioners. According to his testimony, Walsh met with Dobosz and LaSalata on September 11, 1980, and told them of the accumulating evidence against them. He warned them they would probably be identified as the John Doe police officers in Cunningham's complaint, and that they would be subpoenaed before the Commissioners. Officer Cisko took statements from them at this meeting, including LaSalata's admission that he had given Meekins his metal flashlight, the object with which Cunningham had claimed he was beaten.

The Court, faced with this clear conflict in the testimony, judges the matter as one of credibility. Both Officers Dobosz and LaSalata were credible witnesses with good memories in other respects, and revealed no reason the Court should doubt their testimony on this issue. Defendants made no attempt to rebut their claims with any written record, although a stenographer was present when Walsh met with the officers, nor with the testimony of Officer Cisko, who also was present. The Court finds, then, that Dobosz and LaSalata had no notice of the ongoing investigation, and that they gave statements to Cisko and to the Commissioners in an uninformed state of mind.[22]

An instructive analogy may be drawn to the situation where a target of an investigation testifies before the grand jury. While it is not required that *Miranda* warnings be given to the prospective witness, *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), the courts of this Circuit endorse the practice of warning the witness that he is the target of the investigation. *United States v. Ruffin*, 575 F.2d 346 (2nd Cir. 1978); *United States v. Jacobs*, 547 F.2d 772 (2nd Cir. 1976); *United States v. Pepe*, 367 F.Supp. 1365 (D.Conn.1973). The warning comports with basic fairness by insuring that the witness will speak with an informed state of mind when he makes potentially incriminating statements, even though he may not have a constitutional right to remain silent. The same rationale underlies the notice requirement of the B–111 procedure which provides that an officer whose conduct is the subject of a citizen complaint be notified that he is under departmental investigation.[23] In this case, neither Officer Dobosz

---

**22.** On the issue of credibility, the Court is also troubled by defendants' failure to rebut Officer Dobosz's testimony that Superintendent Walsh told him at the September 1980 meeting that a jury would not believe his story, and that he believed the Superintendent was asking him to amend his version of the facts. Both Superintendent Walsh and his attorney were in the courtroom while Dobosz testified, and so was Officer Cisko, but when Walsh later testified as to what had occurred at that meeting, he made no effort to rebut or explain Dobosz's impres-

sion. The Court has no choice but to credit Dobosz's testimony that such was his fair impression of Walsh's conversation with him, since it finds Dobosz a credible witness.

**23.** Plaintiffs' Exhibit 2 sets forth the B–111 procedure. The analogy of that procedure to a grand jury investigation, while persuasive, is nonetheless limited. A police officer subpoenaed before the Commissioners must answer questions put to him, or else be dismissed from the department for his silence. A target wit-

nor LaSalata was named in Cunningham's complaint, so the B–111 notice requirement was not triggered. Nevertheless, they clearly had become targets of the Commissioners' investigation after Cunningham appealed from the department's earlier decision that charges were not sustained. The Commissioners heard claims that one white officer kicked Cunningham, and that one of them gave to Meekins the metal flashlight with which Cunningham claimed he was beaten. At his meeting with Superintendent Walsh and Officer Cisko, after such evidence had been presented to the Commissioners, but without being told that he was under investigation, LaSalata admitted lending his flashlight to Meekins. The next month, both Dobosz and LaSalata testified before the Commissioners without knowledge that they were targets, reasonably assuming that Meekins was the focus of the Commissioners' inquiry. Fair play dictates that notice precede a target witness's giving such testimony which is later used to his disadvantage.

■ Determining whether notice to the officers is a requirement of due process involves balancing three factors: (1) the private interest affected; (2) the risk of an erroneous deprivation and the probable value of additional safeguards; and (3) the government's interest in light of the function performed and the fiscal or administrative burdens that additional safeguards would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), *Keeler v. Joy*, 641 F.2d 1044 (2nd Cir. 1981). In this case, the Board of Commissioners had no cognizable interest in not informing the police officers that the investigation had focused on them. A prompt suspension neither occurred[24] nor was necessary in this case, though an immediate suspension might take precedence over the giving of notice in another situation. On the other side of the scale, an officer's private interest in making a statement to Superintendent Walsh and to the Commissioners with the knowledge that he is under investigation is entitled to protection. Finally, since it is likely that the Commissioners would have had a more sound basis for deciding whether Dobosz and LaSalata should have been suspended if they had clarified the objective of their inquiry, in their own minds and to the officers, rather than proceeding on an unguided fishing expedition, and a requirement of notice would have compelled clear consideration of their purpose, the interest in preventing an erroneous deprivation tips the balance in favor of requiring notice.

■ The second prong of plaintiffs' due process challenge is that they were suspended without cause. It is beyond dispute that police officers in Bridgeport hold jobs that are terminable for cause, but not otherwise. The employment contract negotiated by the union protects employees from suspension, dismissal or reduction in rank except for "just cause."[25] The city charter offers the same job security by permitting suspension, removal or expulsion only for "just and sufficient cause."[26] At the very least, then, plaintiffs have state contractual and public law rights that their suspensions be founded on cause, and not on arbitrary decisions of the Commissioners.

■ State statutory rights are not the exclusive definition of an employee's right to continue in his job. Procedures surrounding statutory rights are subject to federal court scrutiny under the due process clause. *Keeler v. Joy, supra*, at 1050. This Court finds that the suspensions of Dobosz and LaSalata were without cause, and, therefore, violated due process.

---

ness appearing before a grand jury may remain silent under his Fifth Amendment privilege, and, on a valid claim of privilege, be exempt from sanctions. Notice to the target witness may alert him to the advisability of remaining silent, whereas notice to the police officer does not serve the same purpose necessarily.

24. Suspension was effectively made on January 22, 1981, sixteen months after the alleged use of excessive force.

25. Defendants' Exhibit 501, Article V, Section 1.

26. The Court takes judicial notice of Chapter 17 of the Bridgeport Code, § 230.

■ No Commissioner recorded any finding of probable cause to believe that either Dobosz or LaSalata had violated a departmental rule before voting to suspend. They voted and then, after the Commissioners believed they had made an effective suspension, directed Superintendent Walsh to draw up charges, without suggesting to him what charges might be relevant to the reason for their vote. According to testimony before this Court, the reason for the suspension was the Commissioners' perception of a discrepancy in testimony given to them by various witnesses, and the need to protect the city's interests.[27] Neither of those reasons is "cause" related to an employee's merit, which the contract and charter seem to contemplate. Indeed, the Commissioners have told this Court that they have no views as to the merits of the officers' conduct, and that at the time they voted to suspend had no opinion about the officers' involvement in the Cunningham incident.

Using the analysis suggested in *Mathews v. Eldridge, supra*, this Court finds that the suspension without a factual predicate of cause runs against due process requirements. The private interest, that of a police officer to be suspended only for "just cause", is clearly defined in the contract and city charter, and is entitled to great weight. The risk of erroneous deprivation is high, since the suspensions appear to be unrelated to any relevant cause, and the vote to suspend preceded the articulation of charges by the Superintendent. Finally, there was no need for the suspensions to be effected before the Commissioners entered a threshold determination of probable cause. Since sixteen months passed between the incident in question and the officers' suspensions, neither Dobosz nor LaSalata was perceived as a danger to the community, and there was no need to purge the police department of their presence, the suspensions could have awaited the recording of probable cause findings, and reasons for them.

This holding applies to Officer Meekins also, since there was no finding of cause recorded as to him, nor was there any evidence that his suspension was necessary to protect the community or to preserve a positive public image of the police department.

## IV.

Officer Meekins challenges the ability of the Commissioners to judge his case impartially, as due process requires. He claims their objectivity has been impaired by other litigation between himself and the Commissioners, by complaints filed with federal and state agencies, and by his affiliation with the Guardians. He further claims that the Commissioners have already acted upon their belief that he should not be on the police force by dismissing him in March 1978.

■ While there is a presumption that public officials, such as the Commissioners, are honest and capable of impartial judgment, *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), that presumption may be rebutted by, *inter alia*, a factual showing that prior personal criticism or a history of adversity has tainted the official with bias. Acknowledged exceptions to that presumption exist, for example, where a defendant in a contempt proceeding shows prior hostility between himself and the judge who proposes to hear the contempt charges, *Taylor v. Hayes*, 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974), *Mayberry v. Pennsylvania*, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971); and where a teacher dismissed by a school board shows that the reason for the dismissal was the board's sensitivity to his criticism, *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

The record in this case documents extensive prior litigation between Officer Meekins and the Commissioners, and the Court adopts the findings of fact as proposed by Meekins.[28] The Commissioners were indi-

---

**27.** Testimony of Robert G. Bruno, Arthur J. DelMonte.

**28.** Proposed Findings of Fact, filed February 9, 1981, Nos. 1–10.

vidually named as defendants in *Bridgeport Guardians et al v. DelMonte et al,* B-78-175. The Board has already once terminated Officer Meekins, in March 1978, though that decision was reversed by the state Board of Mediation and Arbitration. It is hard to imagine that the slate was wiped absolutely clean by the Board's reinstatement of Meekins, and that the Commissioners' prior determination that he was unfit has no bearing on the current suspension. The record in this case supports an inference of personal animosity between Meekins and the Commissioners which their disclaimers do not diminish.[29]

The record also leads to an inference that the Commissioners may have acted out of concern for the city's fiscal interests. Funding to the city was threatened by the complaint filed by Meekins with the Office of Revenue Sharing. The city's public image was undermined by the Connecticut Commission on Human Rights and Opportunities' finding of discrimination just before the vote to suspend. Although it is too early to tell what impact the CCHRO's finding will actually have on the ORS's decision, it is likely that the federal agency will not be oblivious to the state finding that the city has acted in a discriminatory manner. In any event, several Commissioners testified that they knew of and were concerned about both the federal and state agency proceedings jeopardizing the city's interest.[30]

Although these facts present a case unlike other reported cases, the Court, using a "realistic appraisal of psychological tendencies and human weaknesses", *Withrow v. Larkin, supra,* 421 U.S. at 47, 95 S.Ct. at 1464, concludes that the Commissioners have reason to lack impartiality, and that the risk of bias and prejudgment is too

great to allow the Commissioners to determine the charges against Officer Meekins. The Court's holding is not predicated upon a finding that the Commissioners have actually prejudged the case, but rather upon an evaluation of the evidence in light of "local realities" that leads to the prediction that bias and prejudgment are likely to fatally infect the fact finding and disciplinary process.

The charges against Officers Dobosz and LaSalata are so linked to Cunningham's complaint against Meekins that it is impossible at this juncture to distinguish how the Commissioners might act with regard to them from how they are likely to act as to Meekins. Therefore, Meekins' showing of bias against him operates to disqualify the Commissioners from proceeding against any of the officers.

## V.

A final reason for the Court's injunction is a conflict of interest which affects both sets of plaintiffs, Dobosz and LaSalata on the one hand, and Meekins on the other.[31] There is severe adversity of interest between the three officers who hope to be reinstated to their jobs, and the city which could be found liable if the Commissioners' investigation and discipline of them is not rigorous. While municipal liability is always a lurking possibility in this post-*Monell* era, its probability is unusually acute in this case where Cunningham has filed a complaint in federal court alleging § 1983 liability of the city for a custom or policy of not instituting disciplinary proceedings, of not completing investigations begun, and of not according proper deference to citizens and their attorneys who file complaints against police officers.[32] While the conflict

---

**29.** *Several Commissioners testified that they were not biased against the officers. Those disclaimers are hardly more persuasive to the Court than a criminal defendant's claim that he is not guilty in the face of evidence of guilt.*

**30.** Testimony of Robert G. Bruno, John O'Leary.

**31.** *The conflict noted and discussed herein is underscored by the apparent conflict inherent in the City Attorney's Office representing the Commissioners in this lawsuit, the city in Cunningham v. Meekins, et al, the Mayor in proceedings before the Office of Revenue Sharing, and the city before the CCHRO.*

**32.** Count 4 of the complaint in *Cunningham v. Meekins,* et al, containing allegations of munici-

between the goals of the officers and the city, acting through its Commissioners, is apparent from the pleadings of the several court cases now pending, the Court also finds evidence of conflict in evidence offered in this case.

The Commissioners were deferential to Attorney Shapiro at each of the hearings conducted on the Cunningham complaint. Shapiro presented and examined the witnesses, and he restricted his questioning to events subsequent to Cunningham's arrest. While Shapiro's efforts to restrict the disclosure of information that could adversely affect his client's appeal and possible new trial in connection with his state court conviction is understandable, the Commissioners' acquiescence in the limitation of evidence is surprising. Cunningham's behavior prior to the arrest could very well have affected Meekins' judgment as to what steps were necessary to effect the arrest, and Meekins' loss of his mace cannister in an earlier scuffle could explain his inability to subdue Cunningham without physical contact after the arrest. Presumably, the Commissioners would want to set Cunningham's claims in an accurate chronological background. Indeed, Commissioner DelMonte asked that they be told about the entire incident, but Attorney Shapiro refused to comply. In the later hearings, DelMonte concurred with Walsh that testimony should be restricted to post-arrest events, focusing on the alleged use of force by Meekins.[33]

The Commissioners were well aware of Cunningham's federal court complaint against the city alleging § 1983 liability of the city, and there is evidence that their concern about alleged "cover-up" investigations encouraged stricter scrutiny in this one. At the July 8, 1980 hearing, Superintendent Walsh asked Shapiro about the lawsuit, and commented that "[w]e conduct investigation in all cases where the city is being sued and the department is being sued."[34] He was obviously concerned about the financial liability of the city, since he explained to Shapiro that it would be improper for a complainant to take advantage of the Commissioners' investigation when he was "suing the city and the financial interest of the city is in danger. Let's face it it's just not proper."[35] In fact, Walsh even told Meekins' attorney that the motivation for the Commissioners' thorough review of the matter was the federal lawsuit.

> Atty. Hodgson: I want to remind the Commissioners that they and Mr. Meekins are on the same side of this lawsuit.
>
> .    .    .    .    .
>
> Supt. Walsh: Oh, they know... In fact that's why they're ah, that's why they want to review tapes and everything else. They, they realize that. So am I on the same side.[36]

The Commissioners' desire to conduct a rigorous review of Cunningham's complaint, without appearing deferential to Meekins, may explain why some of them never read Captain Sharnick's report clearing Meekins of the charges,[37] and why they accorded little, if any, weight to the department's dismissal of the B–111 complaint on January 9, 1980, months before the federal complaint was filed.

With a conflict of interest so permeating the proceedings, and a showing that they are well aware of the City's interests, the Commissioners cannot be presumed immune to the influence those interests have on their functioning as an impartial tribunal to

pal liability, is based on *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) which held that a municipality may be liable for violations of 42 U.S.C. § 1983.

**33.** Defendants' Exhibit 506(b), July 8, 1980 hearing, pp. 2–3, July 15, 1980 hearing, p. 24, September 9, 1980 hearing, p. 10.

**34.** Defendants' Exhibit 506(b), July 8, 1980 hearing, p. 27.

**35.** *Id.*, p. 29.

**36.** Defendants' Exhibit 506(b), September 9, 1980 hearing, p. 8.

**37.** Testimony of Robert G. Bruno, Arthur J. DelMonte.

hear and decide charges against officers whose interests are adverse to municipal interests.

## VI.

The Court finds each one of the three arguments discussed above persuasive reason to enjoin the Commissioners from acting, and rests its decision on their joint force. Accordingly, a preliminary injunction may issue. The Court does not decide, because not asked to decide, what person or persons may now hear charges against the officers.

It is SO ORDERED.