**John DOBOSZ, Plaintiff–Appellee,**

v.

**Joseph A. WALSH,**
**Defendant–Appellant.**

**No. 205, Docket 89–7524.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 20, 1989.
Decided Dec. 28, 1989.

Stefan R. Underhill (Day, Berry & Howard, Stamford, Conn., of counsel), for defendant-appellant.

John R. Williams (Karen Lee Torre, Williams & Wise, New Haven, Conn., of counsel), for plaintiff-appellee.

Before MESKILL and WINTER, Circuit Judges, and LASKER,* District Judge.

WINTER, Circuit Judge:

This appeal follows the denial of immunity on a motion for summary judgment by the defendant, Joseph Walsh. The litigation concerns Walsh's actions as the Superintendent of the Bridgeport, Connecticut, Police Department, with regard to plaintiff, John Dobosz, an officer on that force. Dobosz alleges that Walsh violated his rights under the First and Fourteenth Amendments to the Constitution by suspending him without notice, cause or an opportunity to give his side of the controversy, by subjecting Dobosz to a series of punitive transfers and reassignments, and by allowing or encouraging a department-wide campaign of harassment against him. Dobosz alleges that these acts were in retaliation for his cooperation with federal officials investigating the shooting of a youth by another Bridgeport officer and his testifying against that officer in a federal criminal prosecution.

---

* The Hon. Morris E. Lasker, Senior United States District Judge for the Southern District of New York, sitting by designation.

Walsh has twice sought summary judgment. His first motion asserted that Dobosz had not been deprived of any constitutionally protected liberty or property interest. Summary judgment was denied. By a renewed motion, Walsh claimed that he was shielded from liability by absolute or qualified immunity and that Section 1983 did not impose the *respondeat superior* liability necessary to support Dobosz's harassment theory. This is an appeal from the denial of that motion. We reject the claim of absolute immunity. We hold, however, that Walsh has qualified immunity from Dobosz's due process claims but no immunity from the First Amendment retaliation claim.

## BACKGROUND

We view the evidence in the light most favorable to the plaintiff. John Dobosz has been employed as a police officer by the City of Bridgeport since 1971. On July 6, 1977, while on duty, he happened upon the site at which Officer Robert Fitzgerald, also of the Bridgeport Police, had just shot a teenage male. After asking Fitzgerald what had happened, Dobosz left the scene for a moment. He claims that when he returned, there was a knife lying next to the boy's body that he had not observed when he first viewed the victim. Dobosz believed that the knife was a "throw down" weapon placed near the youth after the shooting in order to create a bogus self-defense justification. However, Dobosz was not questioned by anyone in the department about the shooting anytime in its immediate aftermath.

The killing subsequently came under investigation by federal officials. Dobosz was contacted by federal investigators in early 1981 and cooperated with them. This cooperation was for a time unknown to either Superintendent Walsh or the Department. In June 1981, however, Bridgeport police officials learned that Dobosz had testified before a federal grand jury. On June 24, Dobosz was ordered to report to Inspector Anthony Fabrizi, Walsh's assistant, for an interview regarding the Fitzgerald matter. At that interview, he gave a sworn statement regarding the shooting. He was also questioned about the content of his grand jury testimony and about the possibility that he had been "wired" to record the session with Fabrizi. He refused to answer these questions.

Shortly after the meeting with Fabrizi, Dobosz experienced several incidents of harassment. His car was vandalized in the police parking lot. Various offensive notations also appeared next to his name on the overtime list posted in the station, including "rat", "dead man", and "FBI," as well as swastika symbols. He also received nuisance phone calls at his home. Dobosz lodged formal departmental complaints concerning these incidents.

On November 18, 1981, Dobosz was called to testify as a witness in Officer Fitzgerald's criminal trial for civil rights violations in the federal district court. Superintendent Walsh was present in the courtroom, as were several members of the Bridgeport Police Department. Dobosz testified that he believed that the killing of the youth was unnecessary and that the knife discovered near the victim was a "throw down" weapon.

On cross-examination, defense counsel interrogated Dobosz regarding the answers he had given to Inspector Fabrizi in the June 24 interview. Specifically, he pressed him regarding the description he had given of his own investigation of the scene. Dobosz states that, while giving this testimony, he was highly agitated, nervous and distracted by numerous hostile "gestures" made by officers supportive of Fitzgerald. Much of the present dispute arises out of the following testimony by Dobosz:

Q. Do you remember, sir, this question and answer in your statement under oath to Inspector Fabrizi on June 24, 1981, page 5:

"Question: Did you at either of the times you were near the body check around the base of either of the two trees?"

"Answer: No."?

A. Yes, I made that statement to him.

Q. And it was under oath, correct?

A. Yes, but there were—

Q. You swore—excuse me. It was under oath, correct?

A. Yes, sir.

Q. You swore to the truth of it, correct?

A. Yes.

Q. And you know what being under oath means as a police officer?

A. Yes, I do.

Q. And it was the truth, wasn't it?

A. What I had told Inspector Fabrizi?

Q. Yes.

A. No.

Q. On that day? It was not the truth?

A. No, it wasn't.

Q. You lied to Inspector Fabrizi on June 24, 1981?

A. You can look at it that way.

Q. Well, I'd like you to look at it, sir. Did you lie to Inspector Fabrizy [sic] on June 24, 1981?

A. There are circumstances behind that.

Q. Please answer that question.

A. Yes, I did.

Q. Under oath?

A. Yes, I did.

Notwithstanding the seeming admission of lying to Fabrizi, Dobosz's testimony was anything but clear as to what that lie was, largely because of defense counsel's understandable abandonment of this line of inquiry. Faced with the possibility that further questioning might either establish that no lie had been told or elicit facts that might be harmful to Fitzgerald's defense, counsel went on to other matters. The full import of the testimony quoted above was never clarified.

Fitzgerald was acquitted six days later. In a press conference immediately after the verdict, Walsh announced that Dobosz had been suspended as of noon that day and added that he would seek a warrant for Dobosz's arrest on perjury charges as soon as he could obtain a transcript of the Fitzgerald trial. Dobosz was not afforded either notice or an opportunity to be heard before the suspension was imposed. A few days after the press conference, Dobosz received written notice of the charges upon which he had been suspended—untruthful statements regarding his official police

duties in the June 24 meeting with Fabrizi in violation of Rule 59 of the Rules and Regulations of the Bridgeport Police Department. He was also notified of an opportunity to contest these charges in a full evidentiary hearing before the Board of Police Commissioners, as required by the collective bargaining agreement between the city and the police union.

That hearing was eventually conducted during three sessions of the Board in March and April 1982. As provided by a standing Departmental Procedure Order, Walsh acted as the Department's representative, conducting direct and cross-examination, responding to defense motions and delivering opening and closing statements to the Board. On April 22, 1982, the Board ruled in Dobosz's favor, ordering him reinstated with full back pay and seniority credit.

Meanwhile, incidents of harassment against Dobosz continued. Decapitated rats and garbage were thrown on his property. On February 7, 1982, someone fired several bullets through the bedroom windows of his home. Following his reinstatement in April, Dobosz received seven different changes in his duty assignments, a frequency of transfer allegedly unprecedented on the Bridgeport force.

On October 3, 1984, Dobosz filed a civil rights action against Walsh under 42 U.S.C. §§ 1983 and 1988 (1982), along with pendent state law tort claims. The complaint claimed that Walsh "deprived [Dobosz] of his property interest in his employment and of his liberty interest in his good name as a professional police officer" without due process of law. It also alleged that various acts and omissions by Walsh deprived Dobosz of his rights under the First Amendment to testify in court and to speak out about police matters of public concern.

Walsh's renewed motion for summary judgment asserted that (i) he enjoyed absolute immunity for his prosecutorial actions relating to the suspension, and (ii) he could not be held personally liable for the acts of his departmental subordinates. In his reply memorandum on the motion, he also argued that he had qualified immunity, *see*

*Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The renewed motion was denied, and this appeal followed.

## DISCUSSION

 Walsh argues that because he acted as a prosecutor in presenting the charges against Dobosz before the Board of Commissioners, he was entitled to absolute immunity under *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), and *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

In *Imbler* the Court extended the absolute immunity from suit enjoyed by prosecutors under the common law to actions brought under 42 U.S.C. § 1983. It thus stated:

> If a prosecutor had only a qualified immunity, the threat of § 1983 suits would undermine performance of his duties no less than would the threat of common-law suits for malicious prosecution. A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court. The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages. Such suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate.

424 U.S. at 424–25, 96 S.Ct. at 992.

Two years later, in *Butz,* the Court extended absolute immunity to certain personnel in administrative enforcement proceedings. In *Butz,* the plaintiff was a commodity futures commission merchant who had sued several officials of the Department of Agriculture responsible in varying degrees for issuing an administrative complaint that sought to revoke or suspend plaintiff's registration with the Department. *See Butz,* 438 U.S. at 481, 98 S.Ct. at 2897. The Court held that certain of the defendants performed functions analogous to those of a prosecutor and therefore enjoyed absolute immunity from claims for damages resulting from the performance of those functions. *See id.* at 516, 98 S.Ct. at 2915. Because "[t]he decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution ... [and because] [a]n individual targeted by an administrative proceeding will react angrily and may seek vengeance in the courts," the public interest in the effective execution of administrative policy required complete immunity for officers pressing charges and presenting evidence in public law settings. *Id.* at 515, 516–17, 98 S.Ct. at 2915, 2916.

There is an important difference, however, between the extension of absolute immunity in *Butz* and the one urged by Walsh. In suspending Dobosz, Walsh was acting not as the Department's legal advocate but as a supervisor of public employees. Departmental Regulation No. 51 provided, at the time Dobosz was suspended: "Members of the Department may be suspended by the Superintendent or Captain whenever, in their opinion, such action is necessary. Reports of such action, with the reason therefore [sic], being made to the Board of Police Commissioners and the Superintendent." Because the suspension was unquestionably an exercise of Walsh's powers under Regulation 51, the present case is governed by *Forrester v. White,* 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988), rather than *Butz.* In *Forrester,* the Supreme Court held that a state court judge, although absolutely immune for adjudicatory actions, had no similar immunity with regard to official responsibilities for hiring and firing probation officers. The Court pointed out that:

> a judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and fires assistant district attorneys, or indeed from any other executive branch official who is responsible for making such employment decisions. Such decisions, like personnel decisions

made by judges, are often crucial to the efficient operation of public institutions (some of which are at least as important as the courts), yet no one suggests that they give rise to absolute immunity from liability in damages under § 1983.

*Forrester,* 484 U.S. at 229, 108 S.Ct. at 545.

Whatever role Walsh may have played as an advocate in Dobosz's disciplinary proceedings, therefore, the dispositive fact is that he was Dobosz's employment superior and that the suspension was an employment decision undertaken by Walsh in that capacity under Departmental Regulation No. 51. We therefore believe *Forrester* applies to the suspension, and Walsh does not have absolute immunity with regard to any of Dobosz's claims so far as they relate to the suspension. Because no serious argument can be made for such an immunity with regard to the retaliatory harassment claims, we affirm as to the absolute immunity issues.

■ Walsh argues in the alternative that he has qualified immunity. Although Walsh did not mention qualified immunity in his renewed motion for summary judgment, he did raise it in his reply memorandum on the motion. The district court did not dispose of this belated claim of qualified immunity. However, plaintiff urges that we resolve it now in the interest of judicial economy. Although we are reluctant to reach an issue not addressed by the district court, the prospect of further pretrial proceedings in that court followed by yet another appeal justifies our addressing the issue at this time.

■ Government officials performing discretionary functions are generally protected from civil liability where the challenged conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The existence of such qualified immunity turns on the objective legal reasonableness of those actions under the legal rules prevailing at the time the actions were taken. *See Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct.

3034, 3038, 97 L.Ed.2d 523 (1987). In the instant case, therefore, the question is whether Walsh's acts or omissions toward Dobosz violated clearly established rights of which he should reasonably have been aware. We believe that with regard to the due process claim relating to the suspension, Walsh did not violate any clearly established law. However, Dobosz's allegations that Walsh retaliated against him for the exercise of First Amendment rights raise questions of motivation that make summary judgment based on qualified immunity wholly inappropriate.

Under *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), a plaintiff claiming due process protection under the Fourteenth Amendment must possess a "property" or "liberty" interest that is somehow jeopardized by governmental action, necessitating a pre- or post-deprivation hearing as a safeguard. *See Roth,* 408 U.S. at 571, 92 S.Ct. at 2706.

■ *Roth* held that two kinds of liberty concerns trigger due process rights in the public employment context: (i) the employee's interest in good name and reputation; and (ii) the employee's interest in being able to seek other employment opportunities. *See id.* at 573–74, 92 S.Ct. at 2707. Dobosz has alleged that Walsh's acts and statements were injurious to his reputation. However, under *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), government acts defaming an individual implicate a liberty interest only where the individual suffers a related alteration of his legal status or deprivation of a right recognized under state law. *See id.* at 710–12, 96 S.Ct. at 1164–65. Dobosz suffered no such alteration. He was reinstated with back pay and seniority credit, and his due process claim thus fails the *Paul* "reputation plus" test. *See Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989); *see also Sparks v. City of Atlanta,* 496 F.Supp. 770, 774 (N.D.Ga.1980) ("stigma" suffered by police officer whose sus-

pension was rescinded does not give rise to due process liberty interest).

■ With respect to Dobosz's claim that he was deprived of property without due process, he argues that he was entitled to notice and an opportunity to be heard prior to suspension. It is true that Dobosz had a property interest in continued employment by virtue of the "just cause" termination provision in the collective agreement. *See Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). We have found no authority existing at the pertinent time that supports Dobosz's argument that he had a right to a pre-suspension hearing. The closest precedent appears to have been *Dobosz v. DelMonte,* 509 F.Supp. 964 (D.Conn.1981) (mem.), in which Dobosz himself was the plaintiff and Walsh, although not a party, was a principal actor in the underlying circumstances. *DelMonte* involved a separate disciplinary proceeding against Dobosz, including a suspension, arising out of an incident in which Dobosz and his partner were alleged to have failed to intervene to prevent a third officer from beating a suspect. The Board of Commissioners had suspended Dobosz and his partner after interviewing them in connection with its investigation of the other officer. Judge Daly found that Dobosz and his partner had not been notified that they were themselves the subjects of any inquiry and that Superintendent Walsh prepared formal charges against them only after they had been suspended. *See id.* at 965–68.

Judge Daly enjoined the Board from hearing the charges against the officers, in part on the ground that the lack of prior notice and opportunity to be heard rendered the charging process constitutionally inadequate. *See id.* at 969. Judge Daly did not, however, state that the Constitution imposes a pre-suspension hearing requirement in all cases. Indeed, he explicitly stated that "an immediate suspension might take precedence over the giving of notice in another situation." *Id.* Given that statement, and applying, as we must, an objective test to Walsh's conduct, we conclude that a reasonable police official might at that time have believed that Do-

bosz's testimony was a sworn admission of a Rule 59 violation and that a pre-suspension hearing was unnecessary in view of such an admission. This is a close issue because it is anything but clear whether Dobosz's testimony was a misstatement made under pressure or, if not, exactly what he is supposed to have lied about. Nevertheless, the objective test obliges us to put aside the circumstances suggesting Walsh's bias against Dobosz and to view the latter's naked testimony. After doing so, we conclude that a police supervisor might have reasonably believed at the pertinent time that a pre-suspension hearing was unnecessary where the offending officer admits a violation of departmental rules under oath. We conclude, therefore, that Walsh has qualified immunity with regard to Dobosz's due process claim.

■ Dobosz, however, has also alleged a broad campaign (including the suspension) by Walsh to retaliate against him for his exercise of his First Amendment speech rights. Walsh is not entitled to qualified immunity with respect to this claim. Because Dobosz has adequate evidentiary support for his claim of retaliation to withstand Walsh's motion for summary judgment, we must assume for purposes of discussion that Walsh did retaliate against Dobosz. *See Burtnieks v. City of New York,* 716 F.2d 982, 983–84 (2d Cir.1983) (facts as alleged regarded as true if adequately supported by party opposing motion). The proper inquiry in this context is, assuming Walsh had such a motive, whether it was clearly established in 1981 that such a campaign of harassment (including the suspension) based on the alleged retaliatory motive would violate Dobosz's First Amendment rights. *See Musso v. Hourigan,* 836 F.2d 736, 742–43 (2d Cir.1988). Dobosz clearly was exercising his right to free speech when he cooperated with the F.B.I. and when he testified against his fellow officer in court. Because the proscription of retaliation for a plaintiff's exercise of First Amendment rights has long been established, *see, e.g., Perry v. Sindermann,* 408 U.S. 593, 596–97, 92 S.Ct. 2694, 2696–97, 33 L.Ed.2d 570 (1972), we conclude that Walsh is not entitled to qualified

**1142**

immunity with respect to Dobosz's First Amendment claim. Because the existence or non-existence of a property interest is irrelevant to the First Amendment claim, Dobosz may pursue any damages resulting from the suspension, *see id.* at 596–99, 92 S.Ct. at 2696–98, as well as from other alleged retaliatory actions.

Summary judgment on the ground of no liability under the doctrine of *respondeat superior* is also inappropriate, because questions of material fact exist regarding Walsh's role in the alleged harassing and retaliatory acts. *See Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986).

Affirmed in part, reversed in part and remanded.