The BRIDGEPORT GUARDIANS, INC., Theophilus B. Meekins, Charles D. Smith, and Arthur Carter, Plaintiffs,

v.

Arthur J. DELMONTE, John Devine, John C. O'Leary, Frank Delaquila, Larry Harris, Jr., Robert Bruno and James McCarthy, individually and in their capacities as Police Commissioners of the City of Bridgeport; and the City of Bridgeport, Defendants.

Civ. No. B–78–175.

United States District Court,
D. Connecticut.

Nov. 23, 1982.

Remedy Order Jan. 7, 1983.

Beverly J. Hodgson, Koskoff, Koskoff & Bieder, P.C., Bridgeport, Conn., for plaintiffs.

Paul McNamara, McNamara, Clancy & Kenney, Bridgeport, Conn., for defendants.

## MEMORANDUM OF DECISION

DALY, District Judge.

The Bridgeport Guardians, ("Guardians"), an organization of police officers within the Bridgeport Police Department ("B.P.D.") and the three named plaintiffs, each a Black police officer in the B.P.D. and a present or former officer of the Guardians, have brought this action against the Bridgeport Police Commissioners and the City of Bridgeport, pursuant to 42 U.S.C. §§ 1981 and 1983; Title VI and Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000d *et seq.* and 2000e, *et seq.;* the State and Local Fiscal Assistance Act, 31 U.S.C. § 1242(a); and the first, thirteenth and fourteenth amendments to the United States Constitution. Plaintiffs seek declaratory and injunctive relief, as well as compensatory damages on their own behalf and on behalf of others similarly situated from what they claim is unlawful employment discrimination in the Bridgeport Police Department. In addition, plaintiffs allege that defendants by enacting and maintaining in force impermissibly broad departmental regulations violate plaintiffs' right of freedom of speech.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1334 and 2201; 42 U.S.C. § 2000e–5(f); and 31 U.S.C. § 1244(a).

The following facts are uncontested.

The plaintiff, Bridgeport Guardians, Inc., ("Guardians"), as noted, *supra,* is an association of police officers in the Bridgeport Police Department ("B.P.D."), which has as one of its purposes the promotion of equal employment opportunity and the prevention of illegal employment discrimination in the B.P.D. The plaintiffs Arthur Carter, Theophilus B. Meekins, and Charles D. Smith are Black police officers employed in the Patrol Division of the B.P.D.

The defendant City of Bridgeport is the employer of police officers in the Bridgeport Police Department, which in turn is administered, pursuant to the City's charter, by the Board of Police Commissioners.

The defendants Arthur Delmonte, John Devine, John C. O'Leary, Frank Delaquila, Larry Harris, Jr., Robert Bruno, and James McCarthy were all members of the Board of Police Commissioners during the time in question.

The City of Bridgeport received in 1978–79, and currently receives, federal revenue sharing funds and other federal financial assistance which it uses to pay for B.P.D. health insurance benefits as well as other activities of the B.P.D.

In 1978, plaintiffs filed administrative charges of discrimination against the defendants regarding the alleged instances of discrimination against minority police officers which are at issue in this suit, with the U.S. Department of Justice; the U.S. Office of Revenue Sharing; and the Connecticut Commission on Human Rights and Opportunities. The Connecticut Commission on Human Rights and Opportunities, as is its practice, filed copies of the plaintiffs charges on plaintiffs' behalf with the federal Equal Employment Opportunity Commission ("EEOC"), and on June 19, 1980, the U.S. Department of Justice issued to plaintiffs a Notice of Right to Sue in connection with their EEOC charge. (Plaintiffs' Ex. 2.)

### I. *Employment Discrimination Claims*

Plaintiffs have alleged that defendants have discriminated against minority police officers in violation of 42 U.S.C. §§ 1981 and 1983; Title VI and Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000d, *et seq.* and § 2000e, *et seq.* (hereinafter "Title VI" and "Title VII"); the State and Local Fiscal Assistance Act, 31 U.S.C. § 1242(a).

Since the standards of proof for establishing claims of employment discrimination under the cited statutes differ, the Court turns first to a review of the applicable law.

Claims of employment discrimination on account of race may arise in two different ways. The claim may be based on an allegation that the employer simply treats members of the protected class less favorably than white persons. This type of claim has been referred to as a "disparate treatment" claim. *McDonnell Douglas Corp. v.*

*Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Or, the claim may be based on an allegation that a practice or policy, neutral on its face, in fact impacts more harshly on the protected class than on members outside that class. This is known as a "disparate impact" claim. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). *See also International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–36, n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977).

■ To establish a "disparate treatment" claim of racial discrimination under Title VII of the 1964 Civil Rights Act,[1] plaintiffs must prove not only that they were treated differently and less favorably than similarly situated white employees, they must also prove that such different treatment was prompted by a discriminatory intent on the part of the employer—that is, that the employer treated them differently *because of their race. Teamsters, supra.* Of course, in some situations, discriminatory motive may be inferred from the mere fact of differences in treatment. *Schwabenbauer v. Board of Education of City School District of Olean,* 667 F.2d 305 (2d Cir.1981).

■ To establish a "disparate impact" claim of racial discrimination under Title VII proof of discriminatory motive or intent is *not* required. *Teamsters, supra; Schwabenbauer, supra.*

■ The same standards apply to discrimination claims brought under the State and Local Fiscal Assistance Act, 31 U.S.C. § 1242.[2] *United States v. City of Chicago,* 549 F.2d 415, 439–40 (7th Cir.1977), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *United States v. City of Buffalo,* 457 F.Supp. 612, 619 (W.D.N.Y. 1978), modified on other grounds, 633 F.2d 643 (2d Cir.1980). *See also* 31 C.F.R. § 51.53(b).[3]

■ However, to establish a constitutionally-based claim of employment discrimination, proof of discriminatory intent is required regardless of what theory—treatment or impact—is used. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The Supreme Court recently held that 42 U.S.C. § 1981[4] "like the Equal Protection Clause, can be violated only by purposeful discrimination." *General Building Contractors Assoc., Inc. v. Pennsylvania et al.,* ―— ºU.S. ―—, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). Similarly, in discrimination suits brought pursuant to 42

---

1. The relevant portion of the statute provides as follows:

   "(a) It shall be an unlawful employment practice for an employer—
   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin; or
   (2) to limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

2. The antidiscrimination provision of the State and Local Fiscal Assistance Act provides as follows:

   "No person in the United States shall on the ground of race, color, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity funded in whole or in part with funds made available under subchapter I of this chapter."

3. The cited regulations adopt the E.E.O.C. guidelines established pursuant to Title VII.

   A threshold requirement of an action brought pursuant to the State and Local Fiscal Assistance Act is, of course, that defendant be a recipient of federal funds which are used for employment purposes. *See Association Against Discrimination in Employment v. Bridgeport,* 647 F.2d 256 (2d Cir.1981). As noted, *supra,* that fact is not contested here.

4. That statute provides:

   "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

U.S.C. § 1983,[5] proof of discriminatory intent is also required. *Personnel Administrator v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Knight v. Nassau County Civil Service Commission,* 649 F.2d 157, 161 (2d Cir.1981). Thus, proof that an official action or policy has a discriminatory effect or impact is insufficient to establish a claim under § 1981 or 1983; there must also be proof that that action or policy was racially motivated, that is, that it was prompted by a discriminatory purpose.

■ Such an invidious discriminatory purpose, however, in some cases may be inferred from the simple fact or.extent of the impact on members of the protected class. *See Washington, supra,* 426 U.S. at 242, 96 S.Ct. at 2049; *Teamsters, supra,* 431 U.S. at 335–36, n. 15, 97 S.Ct. at 1854–55, n. 15.

■ Proof of discriminatory intent or purpose, regardless of the theory employed, is also required for claims brought against public employers under Title VI of the 1964 Civil Rights Act.[6] *Lora v. Board of Education of the City of New York,* 623 F.2d 248, 250 (2d Cir.1980).

■ In cases alleging employment discrimination, the burdens of proof vary depending upon which theory the claim is based. To establish a *prima facie* disparate-treatment case, brought under any of the cited statutes, plaintiffs must present evidence to establish that they were treated less favorably than other similarly situated employees and that they were so treated because of their race.[7] The latter element—the employer's discriminatory intent or motive or purpose—may be shown by direct evidence, if such exists, or by circum-

stantial evidence, including evidence of the difference in treatment itself, from which an inference of an unlawful motive may be drawn. As already noted, "[p]roof of discriminatory motive ... can in some situations be inferred from the mere fact of differences in treatment." *Schwabenbauer, supra,* 667 F.2d at 309. Once the plaintiffs have established a *prima facie* case of racially discriminatory treatment, the burden shifts to the employer to show a non-race based motive for its treatment of the plaintiffs. *McDonnell Douglas Corp. v. Green, supra* 411 U.S. at 802, 93 S.Ct. at 1824. If the employer makes such a showing, the plaintiffs must then be afforded an opportunity to show that the reason articulated by the employer is, in fact, merely a pretext for discrimination. *McDonnell Douglas Corp., supra,* 411 U.S. at 804, 93 S.Ct. at 1825.

■ To establish a *prima facie* "disparate-impact" claim under Title VII or the State and Local Fiscal Assistance Act, plaintiffs must present evidence that the challenged policy or practice has a racially-discriminatory effect. Once a discriminatory *effect* is demonstrated, the burden then shifts to the employer to demonstrate that the practice or policy has a "manifest relationship to the employment in question" or that it is justified by business necessity. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). If the employer meets his rebuttal burden, the burden shifts back to the plaintiff who may attempt to show that a different policy or practice would equally well serve the employer's business needs without the prohibited racial effect. *See Albermarle Paper*

---

**5.** That statute provides in pertinent part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

**6.** The pertinent portion of Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

**7.** *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) which set forth a framework for establishing a disparate treatment claim.

*Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

■ However, to establish a *prima facie* "disparate-impact" case brought pursuant to 42 U.S.C. §§ 1981, 1983 or Title VI of the 1964 Civil Rights Act, plaintiffs must prove, as noted above, not only the discriminatory effect of the challenged policy but also the discriminatory purpose or intent of the employer, which, as previously noted, may often be inferred from the extent of the effect or impact. As with a discriminatory-treatment claim, the employer may then attempt to rebut plaintiffs *prima facie* case by showing that the practice in question was based on a non-racially-based motive or purpose.

■ Again, as in a disparate-treatment case, plaintiffs must then be given the opportunity to show that the employer's stated reason is merely a pretext for discrimination. This plaintiffs may do by persuading the trier that a discriminatory reason more likely is the basis for the challenged practice, or that the employer's explanation is unworthy of credence.[8] *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

The controlling principles of law relating to the standards and burdens of proof involved in actions brought pursuant to Title VI and VII of the 1964 Civil Rights Act; 42 U.S.C. §§ 1981 and 1983; and the State and Local Fiscal Assistance Act having been set forth, the Court turns to the specific claims at issue here.

### A. *Discrimination in Job Assignments*

Plaintiffs' claim of discrimination in job assignments is three-pronged: First, it is alleged that defendants unlawfully exclude black officers from assignment to the more prestigious specialized divisions of the police department, restricting them almost exclusively to the less skilled, less prestigious assignment of patrol. Second, plaintiffs claim that defendants unlawfully discriminate against minority officers in geographic assignments. And third, plaintiffs claim that defendants have practiced racial segregation of black officers within the patrol division by pairing them on the basis of race and by allowing white officers to avoid being paired with black officers. The Court will address each of these claims in turn.

### 1. *Assignments to Specialized Divisions*

■ The evidence presented at trial established the following facts:

The Bridgeport Police Department encompasses several different divisions. Patrol, the largest division, is responsible for the routine work of patrolling the City and enforcing the laws through crime prevention and the apprehension of suspected violators. All but one of the 33 black police officers in the B.P.D. are assigned to patrol. The B.P.D. also has several specialized divisions which, in addition to being generally more prestigious and/or less stressful than Patrol, afford greater opportunities to gain experience and skills that contribute both to job satisfaction and to the possibility of advancement. (Tr. 34, testimony of Arthur Carter.) The specialized divisions include Tactical, Records, Booking, Police Athletic League, Special Services and the Youth Bureau. Entry-level patrol officers may be assigned to all the specialized divisions except the last two (Special Services and Youth Bureau), and, until 1979, when the Connecticut Department of Labor ruled that only supervisory personnel could work in those two divisions, entry-level officers were assigned there as well.

Although there have been anywhere from 11 to 41 officers assigned to Tactical at various times since 1974 no black officer has, during that entire time, been assigned to that division. (Plaintiffs' Ex. 15, ¶¶ 274–276;[9] Plaintiffs' Ex. 16–18; testimony of Superintendent Walsh).

---

**8.** Evidence that the policy or practice is not job-related or justified by business necessity could be relevant to the issue of pretext. *Cf. Albermarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

**9.** Plaintiffs' statistical evidence relating to the three job assignment discrimination claims, as well as some evidence relating to plaintiffs' other claims came in by way of Plaintiffs' Re-

There are approximately 20 patrol officers assigned to the Records Division. (Plaintiffs' Ex. 15, ¶¶ 277–78; Plaintiff's Ex. 16–18; testimony of Superintendent Walsh). Presently, there is only one black officer assigned to Records, and, although the evidence is somewhat mixed, there apparently have never been more than three black officers in the Records Division. (Plaintiff's Ex. 15, ¶ 278; Testimony of Superintendent Walsh.) Although some assignments to the more sedentary jobs in Records are made on the basis of physical disability, not all such assignments are made on that basis. (Testimony of Charles Smith.)

The evidence does not indicate how many officers are assigned to Booking or the Police Athletic League, but it does show that no black officer has ever been regularly assigned to either of those divisions. (Plaintiffs' Ex. 15, ¶¶ 284–285, 287; Plaintiffs' Ex. 16–18) As with the Records Division, some but not all, assignments to Booking are apparently made on the basis of physical disability.

Prior to the Connecticut Labor Department's ruling in 1979, patrol officers were regularly assigned to the Special Services Division and the Youth Bureau. Yet, through May of 1978, except for in-service training sessions of no more than three days, no black officers were assigned to

Special Services and no black officers were ever assigned to the Youth Bureau. (Plaintiffs' Ex. 15, ¶ 281; Plaintiffs' Ex. 16–18.).[10]

As previously noted, preliminary to the commencement of this suit, plaintiffs filed an administrative charge with the Federal Office of Revenue Sharing ("O.R.S."), alleging many of the same acts of discrimination as are presented in this case. In 1979, the O.R.S. issued its conclusion that defendants had violated the antidiscrimination provisions of the State and Local Fiscal Assistance Act, 31 U.S.C. § 1242(a), and the Public Works Employment Act of 1976, 42 U.S.C. § 6727 (Plaintiffs' Ex. 16, 17, 18.) The O.R.S. based its conclusion in part on its finding that "minorities are underrepresented and underutilized in all divisions except the Patrol Division".[11] (Plaintiffs' Ex. 16, Attachment, p. 5.) The O.R.S.'s report was admitted as evidence at trial pursuant to Fed.R. of Evid. 803(8). *See Chandler v. Roudebush,* 425 U.S. 840, 863, n. 39, 96 S.Ct. 1949, 1961, n. 39, 48 L.Ed.2d 416 (1976).

Assignments to the Special Divisions are made entirely at the discretion of Superintendent of Police Joseph Walsh and other supervisory officers, all of whom are white. (Testimony of Arthur Carter, Supt. Walsh.)

It is not clear whether the allegations regarding discrimination in job assignments should be treated as a disparate-impact or

---

quests for Admissions (Plaintiffs' Ex. 15) which were directed to all defendants and to which the parties who remained defendants at the time of trial never responded. The matters contained in the Requests were thus ruled admitted and conclusively established for trial purposes pursuant to Fed.R.Civ.Pro. 36(a) and (b). In addition, defense counsel stated on the record that he agreed to have the admissions come in. (Trial Tr. p. 68.)

Supt. of Police Joseph Walsh, prior to being dropped as a defendant in the case pursuant to *Owen v. City of Independence* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), had responded to the Plaintiffs' Requests For Admission, although the Court notes that he did so nearly seven months after plaintiffs filed them, and thus, under Rule 36(a) his responses would be untimely and ineffective even as to him had he remained a defendant in the case. In any event, his responses are ineffective as responses for the parties who remained defendants at the time of trial.

The Court notes, nonetheless, that it has compared the responses filed by Supt. Walsh with the matters in the Requests for Admissions and, for the most part, except for minor deviations which would not affect the Court's decision in any event, his responses, by and large, confirm, rather than contradict, plaintiffs' evidence.

10. Plaintiffs made no claim and presented no evidence as to the presence or absence of Hispanic Officers in the Specialized Divisions, and, as to that, the Court makes no finding.

11. The O.R.S., found, additionally, that the B.P.D. unlawfully discriminates in its hiring and promotion practices; in assignments to geographical areas and radio-car partners, as well as in the initiation and severity of disciplinary actions against minority officers. (As to the last three matters, *see* discussion, *infra.*)

disparate-treatment claim.[12]  However, the issue need not be resolved since where, as here, the method of assignment is essentially a discretionary decision of supervisory personnel, all of whom are white, and that discretion has been shown, as here, to have operated to virtually entirely exclude minority employees from certain jobs, the logical inference is that the employer intended to discriminate.  *See Williams v. Colorado Springs School District,* 641 F.2d 835 (10th Cir.1981); *Sledge v. J.P. Stevens & Co., Inc.,* 585 F.2d 625, 635 (7th Cir.1978), *James v. Stockham Valves & Fittings,* 559 F.2d 310 (5th Cir.1977).

Plaintiffs have thus clearly established a *prima facie* claim of intentional racial discrimination, under either a disparate impact or treatment theory, insofar as the assignments to the Specialized Divisions are concerned.[13]

Defendants offered no evidence to rebut plaintiffs' statistics or the findings of the O.R.S.  The only "explanation" offered by defendants for the absence of black officers in the Specialized Divisions was that some assignments to Booking and Records are made on the basis of an officer's physical inability to perform the more strenuous duties of Patrol.  (Testimony of Supt. Walsh.)  While such an explanation *might* be sufficient to rebut the evidence of discrimination in assignments to those two divisions, the nondiscriminatory nature of that explanation is belied by evidence that when Arthur Carter, one of the named plaintiffs here, was physically disabled, he was not assigned to Booking or Records, but rather was reassigned to a particularly stressful and dangerous patrol duty (*see infra*).  Furthermore, such a rationale does not explain the absence of black officers in the other specialized divisions.

The Court thus holds that plaintiffs have established that defendants unlawfully and intentionally discriminated against black police officers on the basis of their race in assignments to the Specialized Divisions of the B.P.D. in violation of Title VI and Title VII of the 1964 Civil Rights Act;  42 U.S.C.

---

**12.**  It would depend, in part at least, on whether one focused on the method employed—that is the discretionary manner of making assignments—or the result of that method.  Several courts have concluded that, where the practice in question is a discretionary decision by white supervisory personnel, disparate impact is the more appropriate theory.  *Williams, supra; Sledge, supra.*

**13.**  The intentional nature of the discrimination is further established by the fact that defendants, since 1979, have been aware of the O.R. S.'s findings, and, despite numerous compliance negotiations between the City, the Department and the O.R.S., the defendants to date have done nothing to change the conditions or practices which the O.R.S. found to be discriminatory, and have, in fact, refused to execute two different compliance agreements prepared by the O.R.S. following negotiations with the City.  (Testimony of Arthur Carter, Supt. Walsh; Plaintiffs' Ex. 17 & 18.)

Furthermore, the Court agreed to take judicial notice of prior civil court actions involving the Bridgeport Police Department or its practices.  In *Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Service Commission,* 354 F.Supp. 778 (D.Conn.1973) ("Guardians I"), *aff'd in part, rev'd in part,* and *remanded,* 482 F.2d 1333 (2d Cir.1973), then District Court Judge Jon O. Newman held that the hiring procedures of the B.P.D. were discriminatory.  In *Bridgeport Guardians v. Bridgeport Police Dept.,* 431 F.Supp. 931 (D.Conn.1977) ("Guardians II"), Judge Newman held that although the department's detective examination had a discriminatory impact on minority applicants, it was sufficiently job-related to pass muster under Title VII.  Nonetheless, Judge Newman decried the fact that four years after his decision in *"Guardians I,"* there were still no black or Hispanic supervisory officers in the department—a situation which remains true today.  In *Bridgeport Housing Authority Police v. City of Bridgeport,* B–77–130 (D.Conn.), Order of Feb. 14, 1980, this Court enjoined the City and the Police Department from using a promotional examination which, contrary to Judge Newman's order in *"Guardians I,"* had not been validated and which had been shown in prior use to have an adverse impact on minorities.

The Court hopes, in setting forth the above history of litigation, to put this case in historical perspective.  The prior cases also bear on the presence or absence of discriminatory intent on the part of defendants, since they were certainly forewarned of problems within the department.  Yet every step forward appears to have been taken only after Court orders have issued, and defendants appear to have exhibited resistance, if not intranscience, to change in the department.

§§ 1981 and 1983; and the State and Local Fiscal Assistance Act, 31 U.S.C. § 1242(a).

## 2. *Discrimination in Geographical Assignments*

█ Plaintiffs claim that defendants disproportionately assign black and Hispanic officers to the high-crime, high-risk areas of the City, thereby subjecting them to greater danger and stress, more demanding duties and more onerous working conditions than white officers.

The City of Bridgeport is divided into approximately 18 sectors, each designated by a color and a number for purposes of assignment of patrol officers. (Testimony of Arthur Carter.) Patrol officers receive the same rate of pay and benefits regardless of their assignment. Geographical assignments like assignments to the Specialized Divisions, are made by supervisory personnel, all of whom are white.

The sectors designated "Blue 14," "Green 35," "Red 41," "Red 42," and "Red 43" are low-income, high-crime areas of Bridgeport. These areas encompass, for the most part, densely populated areas with public housing projects or other multiple-family dwellings. Not only are a greater number of crimes committed in these sectors than in other areas of the city, but the crimes tend to be more serious and more often involve acts of physical violence. (Testimony of Arthur Carter.) It goes without saying that police officers assigned to any one of these areas experience a heavier workload as well as greater danger and stress than officers assigned to more affluent, lower-crime areas of the city.

The sectors designated "Amber 24," "Amber 25," "Green 38," are low-crime residential areas comprised of middle or upper-income one-family homes. "Amber 21" is a low-crime downtown business area; and "Green 36" is the sector designation of a patrol car which acts chiefly as a backup car for "Green 35" (one of the high-crime areas). (Testimony of Arthur Carter.) Assignment to any one of these sectors involves a lighter workload, less stress and less dangerous duties than assignments to any of the high crime areas. (*Id.*)

If assignments to the various patrol sectors were made without regard to race, it would be expected that minority patrol officers would receive roughly the same percentage of the assignments to each of those areas as is reflected in their representation in the patrol force as a whole.

However, although minority officers (black and Hispanic) comprise only 19.1% (Plaintiff's Ex. 15, ¶¶ 4–8) of the police department's patrol force, they are significantly over-represented in the high crime areas.

For example, although black officers comprise 11.9% of the patrol force, they have been assigned to 21.7% of the patrol assignments in Blue 14; 45.4% of the patrol assignments in Green 35; 60.7% of the patrol assignments in Red 41; 43.7% of the patrol assignments in Red 42; and 47.9% of the patrol assignments in Red 43, all of which, as noted above, are high-crime areas with a greater, more dangerous and stressful workload than other areas of the city. (*See,* Plaintiffs' Ex. 15, ¶¶ 9 to 88; Plaintiffs' Ex. 16–18.)

Hispanic officers, who represent only 7.2% of the patrol force, have been assigned to 13.7% of the patrol assignments in Blue 14; 17.7% of the patrol assignments in Green 35; 4.7% of the patrol assignments in Red 41; 14% of the patrol assignments in Red 42; and 10.7% of the patrol assignments in Red 43. (*See* Plaintiffs' Ex. 15, ¶¶ 9 to 88; Plaintiffs' Ex. 16–18.)

It is clear that black officers are overrepresented in every one of the high crime areas and Hispanic officers are overrepresented in all the high crime areas except for Red 41.[14]

---

**14.** If the statistics for black and Hispanic officer geographical assignments are combined, the overrepresentation of minorities in the high-crime areas is all the more vivid: with the exception of Blue 14, although black and Hispanic officers represent just slightly more than 19% of the force, the *majority* of officers assigned to each of the high-crime areas were black and Hispanic: Blue 14—35.4% minority; Green 35—63.1% minority; Red 41—65.4%

In contrast, in the low crime sectors, black and Hispanic officers have been assigned, respectively, to only 0.7%, and 0.2% of the Amber 24 patrol assignments; 1.5% and 1.5% of the Amber 25 patrol assignments; 1.0% and 0.4% of the Green 38 patrol assignments; 2.1% and 0.7% of the Amber 21 patrol assignments; and 2.1% and 0.9% of the Green 36 assignments.[15] (*See* Plaintiffs' Ex. 15, ¶¶ 9 to 88; Plaintiffs' Ex. 16–18.)

The implications, at least, of the above statistics are bourne out by the O.R.S.'s finding at the conclusion of its investigation of plaintiffs' administrative charges, that defendants discriminated on the basis of race in the geographical assignments of police officers. (Plaintiffs' Ex. 16.)

Geographical assignments, like the assignments to the specialized divisions, are made solely at the discretion of white supervisory personnel. As with the assignments to the Specialized Divisions, that fact, combined with the clear statistical evidence showing that minority officers are grossly overrepresented in high-crime areas, as well as the findings and conclusions of the O.R.S. and the intranscience of defendants in taking any corrective action since those findings and conclusions were issued,[16] leads, again, inescapably to the inference that defendants purposefully and intentionally discriminated on the basis of race in assigning police officers to the different geographical sectors of the City. *Williams v. Colorado Springs School District,* 641 F.2d 835 (10th Cir.1981); *Sledge v.*

*J.P. Stevens & Co.,* 585 F.2d 625, 635 (7th Cir.1978); *James v. Stockham Valves & Fittings Co.,* 559 F.2d 310 (5th Cir.1977).

Defendants offered no evidence to refute the plaintiffs' statistical showing or the O.R.S.'s findings. Defendants' only explanation as to why black and Hispanic patrol officers have had to shoulder far more of the most arduous and dangerous patrol assignments than their numbers in the department indicate should be their fair share, was a vague reference by Supt. Walsh that men are assigned according to "the relative importance that they may have in different types of neighborhoods." (Tr. p. 76.) Insofar as that reference is an oblique way of explaining that officers are matched by race to the racial composition of a sector, such a rationale is not a valid reason for the disparate pattern of work assignments. *See Knight v. Nassau County Civil Service Commission,* 649 F.2d 157 (2d Cir.1981); *Segar v. Civiletti,* 508 F.Supp. 690 (D.D.C.1981).[17] As the Second Circuit noted in *Knight,* such a rationale is "based on racial stereotype that blacks work better with blacks and on the premise that [an employee's] race [is] directly related to his ability to do the job." *Knight, supra,* 649 F.2d at 162. Moreover, the articulation of such an invalid reason is an admission of a racially-based motive.

Thus, the Court concludes that plaintiffs have also proved that defendants intentionally discriminate against black and Hispanic police officers in assignments to geographi-

---

minority; Red 42—57.7% minority; Red 43—58.6% minority.

While it is true, as defendants assert in their post-trial brief, that white, nonminority officers also have been assigned to the high-crime areas, that does not alter the fact that less than 20% of the police force, on the average, is assigned to well over 50% of the high-crime area assignments. Given the gross disparity in assignments, the fact that nonminority officers were also assigned to the high-crime areas indicates to the Court simply that there are not sufficient numbers of minority officers in the department to cover all the high-crime area assignments. That conclusion is supported by the virtual nonexistence of minority officers assigned to the comparatively low-crime areas. *See infra.*

**15.** These figures approach the "inexorable zero" which constitutes an overwhelming showing of disparate impact, if not treatment and creates a clear inference of intentional discrimination. *Intl. Bhd. of Teamsters, supra,* 431 U.S. at 342, n. 23, 97 S.Ct. at 1858, n. 23.

**16.** See n. 13, *supra.*

**17.** *Cf.* 42 U.S.C. § 2000e–2(e), which, as the court in *Segar* noted, specifically excludes race from those characteristics for which a bona fide occupational qualification exception to the Title VII prohibition against discrimination could apply.

cal areas of the City in violation of 42 U.S.C. §§ 1981 and 1983; Title VI and Title VII of the 1964 Civil Rights Act; and the State and Local Fiscal Assistance Act, 31 U.S.C. § 1242(a).

### 3. Pairings of Patrol Officers

■ Plaintiffs claim that defendants unlawfully segregate black police officers by consistently pairing them with other minority officers and by permitting white, nonminority officers to avoid being paired with black partners.[18] If pairing assignments were made randomly or without regard to race, black officers who, as noted, comprise 11.9% of the B.P.D., could expect to be paired with other black officers approximately 11.9% of the time.

The evidence admitted at trial, however, indicates that such color-blind pairing of officers is not the case.[19] Of the 27 black officers who, during the sample period, were paired with other officers in two-officer radio cars, 15 were assigned with other black officers on more than 90% of the occasions they were paired. (Plaintiffs' Ex. 15, ¶ 92.) Twenty-one of the black officers were paired with other black officers on more than 50% of the occasions they were paired. (Plaintiffs' Ex. 15, ¶ 93.) Twenty-three of the black officers were paired with other minority (black or Hispanic) officers on more than 75% of the occasions they were paired (Plaintiffs' Ex. 15, ¶¶ 94–96, 98–177.) Twenty-five of the 27 black officers were paired with other minority officers on more than 50% of the occasions they were paired. (Id.) Only two black officers were paired with white, non-minority officers on more than half the occasions they were paired. (Plaintiffs' Ex. 15, ¶¶ 94–97; 199–206.)

The O.R.S. concluded from its investigation that "53.3% of minority officers are assigned to work with each other ... [while] only ... 17.7% of minority officers are assigned to work with a white officer ... These figures indicate that ... personnel work assignments are being made, at least in part, on the basis of race [which] constitutes a discriminatory employment practice." (Plaintiffs' Ex. 16, Attachment p. 6.)[20]

Again, as with assignments to the Specialized Divisions and the different geographical sectors of the City, partner assignments are made at the discretion of white supervisory personnel. (Testimony of Arthur Carter and Supt. Walsh.) Supt. Walsh testified that the Commanding Officers might take an officer's preference into consideration when making partner assignments. (Tr. 114.) Officer Carter testified that, although he had never been assigned a partner on the basis of his preference, it had been his experience that white officers, who had been paired with him, would on occasion speak to the Commanding Officer, and subsequently Carter or the white officer would be reassigned to a different partner. From Carter's testimony, which at least in part was supported by Supt. Walsh's testimony, the Court infers that the Commanding Officers' discretionary decision as to pairing assignments may have been based, in part at least, on white officers' preference not to be assigned to black partners. That, in and of itself would be sufficient for a *prima facie* case of intentional racial discrimination. When combined with the discretionary nature of the assignment process, plus plaintiffs' telling statistics, and the O.R.S.'s findings, plaintiffs' *prima facie* showing is clear.

Defendants offered no evidence to rebut plaintiffs' statistics, the O.R.S.'s findings, or Arthur Carter's testimony. Nor did defendants offer any explanation for the consistent pattern of pairing black officers exclusively or predominantly with other black or Hispanic officers—other than the asserted "preference" of the officers, which is not a valid rationale for racial segregation of employees.

---

**18.** The plaintiffs made no claim nor presented any evidence that Hispanic officers were so segregated, and the Court makes no finding as to the pairing of Hispanic officers.

**19.** *See* n. 9, *supra*.

**20.** The remaining 29% were determined to work without partners.

The Court therefore holds that plaintiffs have proved that defendants intentionally discriminated against black officers on the basis of their race in the pairing of patrol officers in violation of 42 U.S.C. §§ 1981 and 1983; Title VI and Title VII of the 1964 Civil Rights Act; and the State and Local Fiscal Assistance Act.

### B. *Discrimination in Disciplinary Actions*

█ Plaintiffs claim that black officers, because of their race, are brought up on disciplinary charges more often and subjected to harsher sanctions than white officers.

According to the testimony of Supt. Walsh, he or other supervisory or commanding officers may determine in the first instance whether an infraction of departmental rules has occurred. Supervisory officers also have the discretion to recommend to the Superintendent the severity of the sanction which they believe should be imposed in a given case—ranging from forfeiture of paid holidays to suspension or termination from the department. Where the penalty is loss of holidays, the Superintendent is authorized to impose such sanction without a hearing. More severe sanctions may be imposed only by the defendant Police Commissioners after a hearing, although normally the officer will be suspended from the department by the Superintendent pending the hearing.

The evidence in this case showed that, during the sample period of January 1, 1976, to May 19, 1978, although black officers represented only about one-tenth of the department, they were named for disciplinary action an equal number of times as white officers who represented over 80% of the B.P.D. (Plaintiffs' Ex. 15, ¶ 240.) During the same period, black officers forfeited 24 paid holidays, while white officers, who outnumbered blacks more than 8 to 1, forfeited only 26 paid holidays. (Plaintiffs' Ex. 15, ¶¶ 241–245.) Of the 11 suspensions which occurred during the sample period, six were of black officers; five were of white officers. These statistics strongly suggest that departmental regulations are discriminatorily applied and that disciplinary sanctions are discriminatorily imposed depending on the color of an officer's skin.

That suggestion is confirmed by evidence which showed that black officers are brought up on charges for the same conduct which is ignored when committed by white officers, and that black officers receive harsher sanctions than white officers for the same or similar infractions.

For example, Capt. Leo Budnick and Patrol Officer John McGee, both white officers, were accused of shoplifting at a local department store.[21] No disciplinary charges were brought against and no sanctions were imposed on either Budnick or McGee. (Plaintiffs' Ex. 15, ¶¶ 250–256.) Another white patrol officer, Gerald Lombard, was arrested for shoplifting $48.42 worth of merchandise from a local department store. Departmental charges were brought and Lombard was suspended from the force for six months. (Plaintiffs' Ex. 19F.) In contrast, when Robert Grimes, a black patrol officer, was arrested for shoplifting $2.99 worth of merchandise, he was terminated from the department. (Plaintiffs' Ex. 15, ¶¶ 257–260; 19G.)[22]

On January 20, 1976, Chester Zukowski, a white patrol officer, was terminated from the police department for allegedly threatening his wife with a gun. However, he was reinstated to the department one year later. (Plaintiffs' Ex. 15, ¶¶ 261–263.) Edmund Bish, a black patrol officer, was terminated from the department for similar conduct, but, in contrast, he was never reinstated. (Plaintiffs' Ex. 15, ¶¶ 265–268.)

---

**21.** The only evidence of the allegations against Budnick and McGee is plaintiffs' Requests For Admissions, Exhibit 15, which, as noted, *supra,* n. 9, were deemed admitted and conclusively established due to the failure of defendants to respond to the Requests. Also as noted, such evidence is established only for purposes of the case at bar.

**22.** The Court notes the records show that although both Officer Lombard and Officer Grimes had each executed written statements admitting that they had taken merchandise, criminal charges were apparently only brought against Grimes. No explanation for this appears in any of the documents submitted to the Court as evidence in this case.

White Patrol Officer John Uliano was deprived of 20 paid holidays by the defendants for leaving his assignment without permission to visit a bar and to escort two women home. (Plaintiffs' Ex. 19A.) Similarly, Patrol Officers Edward Moran and Douglas St. Germaine, both of whom are white, received a penalty of forfeiture of 15 paid holidays for leaving their posts without permission and reporting back to duty after drinking. (Plaintiffs' Ex. 19B & C.) In contrast, Patrol Officer Donald Woodard, a black officer, was terminated from the police department by defendant Board of Commissioners for leaving his post without permission. (Plaintiffs' Ex. 19D.[23])

The above examples are cited merely to point out the discrepancy that exists between the nature and extent of disciplinary actions taken against black officers compared to those taken against white officers. The Court does not mean in any way to indicate approval of any of the conduct with which any of the officers specified were charged. However, the clear implication of the evidence is that, if you are black and a member of the B.P.D., you are very likely to be punished—even fired—for conduct which might very well be ignored if you were white, or that you will be punished far more severely than you would be if you were white. The clear inference to be drawn from the cited examples, as well as from the statistics indicating that a far greater percentage of black officers than white officers have been subjected to disciplinary proceedings, is that defendants intentionally discriminate on the basis of race in the amount and kind of discipline meted out to its officers.

Indeed, the O.R.S. concluded the same thing following its investigation of plaintiffs' charges. In addition to citing statistical evidence showing that "a far greater number of minority officers are being disciplined than one would normally expect," the O.R.S. went on to pointedly note that "the city has chosen to ignore the disciplinary system as it pertains to various white officers who have been convicted in court and fined for violations of a person's civil rights in the course of official duty. On the other hand, the record reveals that two black officers have been terminated from the force in the past year when they were arrested on a misdemeanor charge.... [i]t is inconsistent and results in disparate treatment on the city's part to address violations of law so severely for minorities and then ignore it for white officers."
(Plaintiffs' Ex. 16, Attachment, pp. 7–8.)

Defendants offered no evidence to rebut plaintiffs' statistics relating to disciplinary actions taken against black and white officers or the evidence of specific examples of differences in treatment, or the O.R.S.'s findings. Nor did defendants attempt to explain the obvious discrepancies in treatment. Plaintiffs have clearly proved that defendants intentionally discriminate on the basis of race in the number, kind, and severity of disciplinary actions they take against black officers in the department. Such discrimination violates Title VI and Title VII of the 1964 Civil Rights Act; 42 U.S.C. §§ 1981 and 1983; and the State and Local Fiscal Assistance Act, 31 U.S.C. § 1242(a).

C. *Discrimination in Working Conditions*

Plaintiffs allege that defendants have subjected black officers to discriminatory working conditions by fostering, permitting, and maintaining a racially charged work environment.

The evidence introduced at trial indicates that racial slurs and disparaging remarks directed against blacks, as well as racial harassment of black officers are frequent occurrences in the B.P.D., and that they are not only tolerated, but engaged in by supervisory personnel as well as the rank and file, including the head of the department, Superintendent Walsh.

For example, a cartoon-type booklet, entitled "Minority Sergeants Exam" (Plaintiffs'

---

**23.** The Court notes that, according to the records before it, the B.P.D. conducted a very detailed investigation in Patrol Officer Woodard's case, while the investigations of the three white officers appear to be relatively sketchy.

Ex. 12), which contains demeaningly stupid questions, was circulated throughout the Department just before a sergeant's exam was to be administered in January 1980.[24] The obvious intent of the booklet was the derogation of black police officers, the implication being that blacks could only pass a sergeant's exam that was so idiotic. Supervisory personnel reacted to the booklet by joining in laughter about it. (Testimony of Theophilus B. Meekins.) Superintendent Walsh testified that he sent a copy of the booklet to the City's fire chief. The Court finds dubious Supt. Walsh's assertion that the cover of the booklet he saw simply said "Civil Service Exam" rather than "Minority Sergeant's Exam," thus eliminating any racial overtones. Equally dubious in the Court's view is the Superintendent's rather vague assertion that once the racially derogatory nature of the booklet was made known to him, a "full investigation" was conducted, complete with "reports from captains, lieutenants," as apparently nothing resulted from any investigation and no action was taken to halt the booklet's circulation.

Despite a departmental regulation in effect since 1973 (Plaintiffs' Ex. 15, ¶ 215) prohibiting the posting of racial slurs on departmental bulletin boards, a poster, depicting a caricature of a black male figure with a target superimposed over the figure's body and entitled, "Official Runnin' Nigger Target," (Plaintiffs' Ex. 11) was displayed on an official notice bulletin board. (Testimony of Arthur Carter.) Another departmental regulation requires that anything that is posted on department bulletin boards must first be approved by a supervisor. (Testimony of Arthur Carter.) The Court can only assume, in the absence of any evidence to the contrary, that the "target" poster with its clear message of violent hostility toward blacks, was thus approved by supervisory personnel before it was displayed.

Plaintiffs' Exhibit 15 established that there have been many instances of racist slurs being bandied about the B.P.D. Indeed, Supt. Walsh, shrugged off the importance of such remarks and admitted that he himself might have been guilty of making racial slurs. (Testimony of Supt. Walsh.) Black officers apparently have found racial epithets and grafitti on their lockers, as well as in other places in the B.P.D.; police radios have been used to transmit derogatory racial remarks over the air, where they are undoubtedly heard by supervisors as well as the public. (Plaintiffs' Ex. 15, ¶¶ 209–232.)

Despite numerous complaints registered by black officers to commanding officers regarding the racial slurs, harassment and insults, nothing has been done to stop such behavior. (Plaintiffs' Ex. 15, ¶¶ 209–232.)

The evidence thus indicates a pattern of racially insulting and humiliating behavior which apparently has been condoned by supervisory officers. Even if Supt. Walsh's assertions that investigations were conducted was to be credited, it is incredible that a police department which is charged with solving crimes would be unable to uncover the instigators of such behavior within its own ranks and to take appropriate disciplinary action to prevent its continuation or recurrence. Yet, apparently such behavior not only went unpunished, it was laughed off or condoned by those responsible for preventing it.

It is true that such practices and behavior do not directly affect an employee's economic interest in his or her employment. Nonetheless, Title VII, at least, protects more than just economic interests. Section 703(a) of that statute provides that "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or *otherwise*

---

**24.** That exam was enjoined by order of this Court on Feb. 14, 1980, because as noted in n. 13, *supra,* contrary to Judge Newman's order in "Guardians I," the test had not been validated as job-related and because it had been shown in prior use to have an adverse impact on minorities. *See* Memorandum of Decision, *Bridgeport Housing Authority Police v. City of Bridgeport,* B–77–130 (D.Conn., Feb. 14, 1980). (The Guardians were intervenors in that action).

*to discriminate* against any individual with respect to his compensation *terms, conditions or privileges of employment* because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (emphasis added). Title VII further makes it unlawful to "adversely affect [an employee's] status ... because of such individual's race [or] color...." 42 U.S.C. § 2000e–2(a)(2).

It has been said time and again that Title VII is to be afforded a broad and liberal interpretation in order to effectuate its beneficial purpose of eradicating unlawful discrimination from the American workplace. *See, e.g. Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Rodriguez v. Board of Education,* 620 F.2d 362 (2d Cir.1980); *Rogers v. E.E.O.C.,* 454 F.2d 234 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), and cases cited therein.

Title VII has thus been held to require an employer to at least take steps to eliminate or correct a hostile "working environment heavily charged with racial discrimination." *United States v. Buffalo,* 457 F.Supp. 612, 613, 631 (W.D.N.Y.1978), *modified on other grounds,* 633 F.2d 643 (2d Cir.1980); see also *Rogers v. E.E.O.C., supra,* 454 F.2d at 239.[25] Title VII thus gives employees the right to expect that employers will not turn a blind eye to blatant manifestations of racial prejudice and discrimination, and it certainly gives them a right to expect that employers—and their supervisory agents—will not foster or participate in the creation and maintenance of a hostile, racist and discriminatory working environment.

Defendants here have permitted a racially-charged atmosphere to develop and continue in the B.P.D. They have permitted their supervisory personnel to participate in such racial harassment. This constitutes discrimination in the "terms, conditions, and privileges" of black officers' employment, and consequently, a violation of Title VII of the 1964 Civil Rights Act.

### D. *Retaliation Claims*

■ Plaintiffs claim that defendants violated Title VII by taking adverse actions against officers of the Guardians in retaliation for that organization's efforts to eliminate racial discrimination from the B.P.D.

Title VII specifically provides that:

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice, made an unlawful employment practice by this Title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e–3.

Arthur Carter served as President of the Bridgeport Guardians from 1978 to 1981. In 1980, the Guardians and Carter, in his role as President, intervened in *Bridgeport Housing Authority Police, et al. v. Bridgeport,* B–77–130 (D.Conn.) in which they sought and received from this Court, a preliminary injunction prohibiting the use of a racially discriminatory promotional examination.[26]

Carter testified at trial that shortly after the injunction against the Sergeant's Exam was entered his supervisor, Sergeant Trungadi, confronted him by expressing his displeasure with the litigation that gave rise to the injunction. Then, upon learning that Carter had recently been hospitalized for high-blood pressure and artery spasms, Trungadi commented that Carter should be transferred from Blue 12, a low-crime patrol car assignment to a particularly high-risk, high-stress assignment in Red 40 or 41. And, in fact, Carter was subsequently transferred to Red 40. (Testimony of Arthur Carter; Plaintiffs' Ex. 9.) A white officer was transferred into Red 40 at the same time, but he was reassigned almost

---

**25.** *See United States v. St. Louis,* 549 F.2d 506 (8th Cir.), *cert. denied,* 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977); *Gray v. Greyhound Lines, East,* 178 U.S.App.D.C. 91, 545 F.2d 169 (1976); *Barnes v. Costle,* 183 U.S.App.D.C. 90, 561 F.2d 983 (1977).

**26.** *See* this Court's Ruling of Feb. 14, 1980, and n. 24, *supra.*

immediately after he made a request for reassignment. (Plaintiffs' Ex. 9.) Officer Carter made several requests to be reassigned back to Blue 12, all to no avail. (Plaintiffs' Ex. 6–9.) Sergeant Trungadi apparently continued to harass Officer Carter, prompting Carter to send a three-page letter to Supt. Walsh, in which he set forth a series of harassing incidents to which he had been subjected by Trungadi, and he asked to be transferred out of Trungadi's platoon—which request was denied. (Carter's Testimony.) Supt. Walsh testified that Carter was transferred from Blue 12 because he wasn't enforcing parking summonses sufficiently, although he also admitted that Carter was never disciplined in any way for this supposed failure in his performance in his Blue 12 assignment. Defendants offered no evidence to substantiate Supt. Walsh's explanation. Logic would dictate that, under normal circumstances, transferring a police officer, who suffers from hypertension, to a particularly stressful assignment simply because he has not strictly enforced parking summonses would be both counterproductive and an unusually harsh penalty. It must be noted, in addition, that Supt. Walsh also testified that the Department's practice was to assign ailing or disabled officers to desk jobs in the Booking or Records Division. (see p. 608, *supra*). In contrast, Officer Carter's high-blood pressure was met with an assignment to a particularly stressful post.

Considering the testimony as a whole, including judgments as to credibility, the Court finds that Carter's reassignment to Red 40 was done in retaliation for his involvement with the Guardians and in the Sergeant's exam litigation. Such retaliation constitutes a violation of § 704(a) of Title VII, 42 U.S.C. § 2000e–3.

Officer Charles Smith, a 20-year veteran on the police force, and apparently the only black officer assigned to the Tactical Division in 1971, was elected President of the Guardians on a Saturday in early June of 1971. The following Monday, after publication of news reports of his election, he was transferred out of Tactical and into the Patrol Division. Although ten white officers were transferred out of Tactical at the same time—according to Supt. Walsh to "shake the outfit up"—all, except Officer Smith, were transferred back to Tactical or to other specialized divisions. Officer Smith has remained in Patrol to this day. (Testimony of Charles Smith.)

Again, taking the evidence as a whole, including the unexplained reassignment of all white officers, but not Carter, as well as judgments as to credibility, the Court finds that Officer Smith suffered retaliation because of his involvement in the Guardians in violation of § 704(a) of Title VII, 42 U.S.C. § 2000e–3.

Finally, Officer Theophilus Meekins was twice suspended from active duty while he was the President or an active member of the Guardians. The first suspension occurred in April of 1978, while Officer Meekins was President of the Guardians. That action was taken ostensibly on the basis of charges arising from the theft of Meekins' police vehicle. However, after almost a year of suspension without pay, an arbitration panel found that he was unjustly terminated. (*See* Memorandum of Decision, dated March 5, 1981 in *Dobosz v. Delmonte,* 509 F.Supp. 964 (D.Conn.), issued by this Court.)[27] Officer Meekins was subsequently reinstated, although it is unclear whether he ever received the back wages which the arbitration panel directed he be paid.

The second suspension occurred in January, 1981, shortly after the Connecticut Commission on Human Rights and Opportunities ("CHRO") issued a finding of discrimination against defendants. That suspension ostensibly was the result of a citizen's complaint against Meekins for his arrest of that citizen. Meekins was suspended and brought up on charges even though Captain

---

**27.** The Court agrees to and takes judicial notice of the proceedings in *Dobosz v. Delmonte,* 509 F.Supp. 964 (D.Conn.), including the findings of fact made in the March 5, 1981 Memorandum of Decision, which, insofar as applicable, the Court adopts and incorporates in this decision, as well as the record in that case as a whole.

Sharnick, who investigated the complaint, determined that the complaint was not supported by the evidence and recommended that no disciplinary action be taken. (Memorandum of Decision, *Dobosz, supra.*) A panel of special masters appointed by this Court also found, after the fact, that the disciplinary action taken against Officer Meekins was unwarranted under the circumstances. (Report of Special Masters, *Dobosz, supra,* June 5, 1981.)

It appears to the Court now, as it did in March of 1981, that the disciplinary actions taken against Officer Meekins were the result of the defendants' animosity toward Officer Meekins for his as well as the Guardians' actions against discriminatory practices which were taken in administrative agencies as well as in the courts. *Dobosz, et al, supra,* March 5, 1981 Memorandum of Decision. Such actions constitute a clear violation of Title VII's prohibition against retaliatory actions against a person who seeks to enforce that statute's antidiscrimination provisions. 42 U.S.C. § 2000e–3.

## II. *First Amendment Claims*

■ Plaintiffs claim that Bridgeport Police Department regulations numbered 61 and 62 are impermissibly overbroad and void for vagueness and that their enactment unconstitutionally deters plaintiffs from exercising their rights of freedom of speech regarding their efforts to secure equal employment opportunities and their opposition to racial discrimination in the B.P.D. The regulations provide as follows:

"61. Members of the Department shall not speak or write critically or derogatorily of other members of the Department to any person within or outside the Department in matters relating to Department business, order, instructions or action of any members, except in accordance with the Rules and Regulations. 62. Members of the Department shall not deliver public addresses, or disseminate written material, concerning the work of the Department or, under any circumstances, make statements for pub-

lication concerning the plans, policies or affairs of the administration of the Department, unless duly authorized to do so by the Superintendent."

The parties stipulated on the record that the above regulations are unconstitutionally overbroad and vague, and the Court agrees. Such regulations must, then, be excised from the Department's rules and regulations.

### Conclusion

The foregoing represents the Court's decision on the issues involved in this case. An order setting forth the appropriate remedies shall follow in due course.

### REMEDY ORDER

After a full trial of the above matter, this Court has found that the defendants have violated Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981 and 1983, and 31 U.S.C. § 1242. Accordingly,

1. At least fourteen black police officers shall be appointed immediately to positions in the Tactical, Booking and Records Units and in the Police Athletic League, and such assignments shall continue for at least twelve months.

2. Plaintiffs Theophilus B. Meekins and Charles D. Smith, who suffered retaliation because of their association with the Guardians, shall be among the black officers so reassigned to one of the specialized divisions noted in ¶ 1.

3. Defendants, their officers, agents, and employees, shall at all times maintain assignments of black officers to positions in the specialized divisions of the Bridgeport Police Department ("B.P.D.") specified in ¶ 1 on all shifts such that the percentage of black officers so assigned is at least equal to the percentage of black officers in the department. Additionally, defendants shall, within 90 days of the date of this Order, establish a rotation system pursuant to which all patrol officers who desire such assignments will have equal access to assignments in the specialized divisions regardless of race, color, sex, religion, or nationality. Any rotation system shall be sub-

ject to the Court's approval and shall insure that the percentage of black officers assigned to the specialized divisions is at all times at least equal to the percentage of black officers in the department.

4. Defendants or their agents in the B.P.D. shall immediately reassign all black and Hispanic officers who are currently assigned to patrol sectors Red 40, 41, 42, 43 or Blue 14 or Green 35 and who have been so assigned for four months or more to assignments in either Amber 21, 24, 25 or Green 36 or 38 as these sectors were constituted at the time of trial. Additionally, as of 90 days from the date of this Order, the defendants shall establish a procedure, subject to approval by the Court for rotating patrol officers on a regular basis through all the geographical patrol sectors at regular intervals in such a manner that black and Hispanic officers are assigned to sectors Red 40, 41, 42, 43, Blue 14 and Green 35 in no greater percentage than their overall percentage representation in the patrol division and in such a manner that they are assigned to Amber 21, 24, 25 and Green 36 and 38 in a percentage at least equal to their percentage of representation in the patrol division. No black or Hispanic officer who has served four months or more in Sectors Red 40, 41, 42, 43, Blue 14 or Green 35 in 1981 or 1982 shall be assigned to any of these sectors before July 30, 1984, except on a voluntary basis.

5. Plaintiff Arthur Carter, who suffered retaliation because of his association with the Guardians, shall be included among the black officers reassigned to Amber 21, 24 or 25 or to Green 36 or 38. He shall remain assigned to one of these sectors or to a specialized division until such time as an independent qualified physician shall certify that his health no longer makes a non-stressful assignment appropriate.

6. The defendants shall furnish plaintiffs' counsel, on a date 30 days from the date of this order, an accurate roster of the assignments of entry level officers as of that date and shall furnish such information

every three months thereafter for a period of two years.

7. Defendants shall, within 90 days of the date of this Order, establish a pairing assignment procedure which will insure that officers are not paired on the basis of race in two-officer patrol assignments. Such procedure is subject to the approval of the Court.

8. Defendants, their officers, agents and employees, shall not discriminate on the basis of race in the initiation of disciplinary charges or imposition of penalties for infractions of department rules.

9. Defendants, their officers, agents, and employees shall not subject any police officer to harassment, disciplinary action or different treatment of any kind because of such officer's race, color or membership in the Bridgeport Guardians, Inc. or because of his or her opposition to discriminatory practices within the department. Defendants, their officers, agents, and employees are specifically enjoined from engaging in any act or practice whose purpose or effect is to discriminate or retaliate against plaintiffs Smith, Carter or Meekins because of their race, association membership, or opposition to discriminatory employment practices.

10. A qualified, neutral Special Master shall be appointed by the Court[1] to:

a) Review any and all disciplinary actions instituted against any black officer who claims such action is racially discriminatory in purpose or effect; and to recommend an appropriate adjustment in any such action found to be racially discriminatory as to initiation, severity of sanction or otherwise.

b) Receive, investigate, and remedy all complaints of discriminatory treatment, racial harassment or slurs within the B.P.D. and, in appropriate cases, to bring disciplinary charges against those responsible and/or those supervisors who foster or permit such racial harassment to occur in violation of departmental rules.

1. Each of the parties is requested to submit, within one week of the date of this Order, the names of three persons for the Court's consideration in appointing a Special Master.

c) Review any disqualification of any black officer seeking promotion which disqualification is based on grounds of any suspension, disciplinary action, or alleged misconduct upon which such sanction was premised occurring from 1978 to the date of this Order.

Any actual or threatened disciplinary action found to have been racially discriminatory in either initiation or severity of sanction imposed shall not be grounds for disqualification from the taking of any promotional examination or actual promotion during 1983 or 1984.

Any fees of the Special Master shall be borne by defendants' in their official capacity.

The Special Master's findings and/or recommendations in each of the areas specified may be appealed to this Court. The Master's findings and recommendations shall normally be accepted unless clearly erroneous. Fed.R.Civ.Pro. 53(e)(2). The party taking such appeal shall be liable for all costs, including attorney's fees, incurred in the taking of such appeal unless the appellant prevails on appeal.

11. Defendants shall immediately inform all supervisory personnel in the Bridgeport Police Department of the terms of this Order and shall take all steps necessary to insure that they effectuate compliance with this Order.

12. Defendants shall immediately notify each employee of the Bridgeport Police Department that department Regulations 61 and 62 are no longer in effect.

13. Defendants shall, effective 91 days from the date of this Order, be immediately enjoined from spending or using any federal funds, including revenue sharing funds, unless defendants can establish to the satisfaction of this Court that those portions of this Order requiring immediate action or action within 90 days (¶ 1, 2, 3, 4, 5, 6, 7, 8, 11, 12) have been fully complied with.[2]

14. This Court shall maintain continuing jurisdiction in this matter to insure complete and continuing compliance with all aspects of this Order.[3]

15. The plaintiffs, having prevailed in this action, are entitled to an award of

**2.** *Cf. United States v. Chicago,* 395 F.Supp. 329 (N.D.Ill.1975) *Aff'd* 525 F.2d 695 (7th Cir.1976) (preliminarily enjoining the disbursement of federal funds to municipal police department with a history of racial and sex discrimination); *United States v. Chicago,* 411 F.Supp. 218, 245 (N.D.Ill.1976) (making the preliminary injunction permanent until the "City ... brings itself into compliance with the requirements of law."), *aff'd on that point, modified on other grounds,* 549 F.2d 415, 439–42 (7th Cir.) *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).

**3.** Plaintiffs claim for "compensatory damages incidental to equitable relief" for the humiliation suffered by them as a result of racial slurs and disparagement permitted by defendants is denied for two reasons: First, the evidence adduced at trial does not establish any basis for computing damages or for particular entitlement to damages. Second, such damages unlike backpay, are clearly legal, not equitable, in nature, and this Court granted plaintiffs' motion to strike defendants' jury demand in part because plaintiffs amended their complaint by abandoning their claim for damages. Since neither the named plaintiffs nor any member of the class they represent are entitled on the evidence in this case to backpay, no monetary damages can be awarded.

In addition, plaintiffs requested reinstatement of Officers Bish and Grimes is also denied. This Court made no specific finding that defendants acted unlawfully in their treatment of Bish and Grimes. Rather, the treatment of those two officers, as compared to white officers, was cited merely as examples of the disparity between disciplinary actions taken against black officers and white officers. As noted in the Memorandum of Decision, this Court does not indicate approval of any of the conduct with which any of the officers cited as examples were charged. The fact that white officers may have "gotten away" with conduct for which they perhaps should have been terminated does not require this Court to order reinstatement of black officers who may have been more harshly, but, perhaps, more appropriately punished. Moreover, the complaint in this action never raised the issue of reinstatement of Bish and Grimes. Messers Bish and Grimes were not precluded from seeking reinstatement through union grievance procedures, EEOC administrative remedies or individual court action. Indeed, barring statute of limitations problems, there may be avenues still open to them. Perhaps most importantly, the record in this case, based on the evidence presented at trial, simply does not justify the reinstatement of Bish and Grimes by this Court.

attorney's fees and costs in an amount to be determined in a separate proceeding.

It is So Ordered.