**THE BRIDGEPORT GUARDIANS,**
**et al. Plaintiffs,**

v.

**Arthur J. DELMONTE,**
**et al., Defendants**

**No. CIV. 5:78CV175(JBA).**

United States District Court,
D. Connecticut.

April 27, 2005.

---

Angela Carol Robinson, Antonio Ponvert, III, Joan C. Harrington, Michael P. Koskoff, Vincent M. Musto, Koskoff, Kos-

koff & Bieder, P.C., Thomas D. Flynn, Bridgeport, CT, Joel Thomas Faxon, Stratton Faxon, New Haven, CT, Richard Herlihy Shelton, CT, Carolyn Roberts Linsey, Owens, Schine & Nicola, Trumbull, CT, Raymond W. Ganim, II, Law Offices of Raymond W. Ganim, Stratford, CT, H. Jeffrey Beck, Bridgeport, CT, William B. Barnes, Rosenstein & Barnes, Fairfield, CT, for Plaintiffs.

Arthur C. Laske, III, Mark T. Anastasi, City of Bridgeport Office of the City Attorney, Raymond B. Rubens, Thomas K. Jackson, Thomas F. Maxwell, Jr., Pullman & Comley, Melanie J. Howlett, City of Bridgeport Office of the City Attorney, Bridgeport, CT, Bernard E. Jacques, Pepe & Hazard Goodwin Square, Donald C. Mahoney, Updike, Kelly & Spellacy, P.C., Hartford, CT, Dana R. Baughns, Shipman & Goodwin, Stamford, CT, Sandra P. Lax, Fairfield, CT, Stephen F. Donahue, Kleban & Samor, PC, Southport, CT John Patrick Bohannon, Jr., Fairfield, CT, Diane Benevides, Rhode Island Office of the Attorney General, Providence, RI, John J. Kelly, Jr., Cantor, Floman, Gross, Kelly, Amendola & Sacramone, Orange, CT, for Defendants.

*Ruling On Special Master's Recommended Ruling Re: Slur and Harassment Policies [Doc. # 1294]*

ARTERTON, District Judge.

Before the Court is Defendants' Objection [Doc. # 1306] to the Recommended Ruling of the Special Master Regarding Slur and Harassment Policies [Doc. # 1294] at the Bridgeport Police Department. For the reasons that follow, the implicit conclusion of the Recommended Ruling that the Department is in contempt will be approved and adopted. As directed in open court on April 27, 2005, the Department will be given another opportunity to present evidence to the Special Master

on its financial resources and the potential burden of the recommended sanction.

## I. Factual Background

As the Recommended Ruling details, defendant Bridgeport Police Department ("BPD" or "Department") has a long history of foot-dragging and non-enforcement of its racial, ethnic and sexual slur and harassment policies:

Under Paragraph 10(b) of the 1983 Remedy Order, this Court empowered the Special Master to "[r]eceive, investigate, and remedy all complaints of discriminatory treatment, *racial harassment or slurs* within the B.P.D., and, in appropriate cases, to bring disciplinary charges against those responsible and/or those supervisors who foster or permit such racial harassment to occur in violation of departmental rules." *Bridgeport Guardians, Inc. v. Delmonte,* 553 F.Supp. 601, 619 (D.Conn.1982). Since at least 1986, the Department has maintained a policy and procedure on racial, ethnic and sexist slurs. In 1990, the Department revised those policies, "to ensure that each employee of the Department is fully cognizant of his/her responsibilities [under the policy and] ... that all incidents will be treated similarly in a swift and efficacious manner." *Recommended Ruling,* dated March 21, 1990 (approved, adopted & affirmed May 11, 1990 (Daly, J.)).

The Department's enforcement of its slur policy waned in the ensuing years and on March 25, 1997, this Court directed the Department to review and revise its 1990 policy on racist, ethnic and sexist slurs and harassment. In ordering revisions to the policy, the Court wanted "to ensure that all employees know and understand their responsibilities." See *Recommended Ruling re: Complaint of Detective*

*Raymond Sherwood,* dated March 25, 1997 (approved & adopted March 30, 1998 (Arterton, J.)).

After hearings the Court disapproved the Department's "fourth draft" of a new policy covering racial, ethnic and sexist slurs and graffiti, ordering the parties to revise it before November 26, 1997 so that it covered harassment as well as slurs and graffiti. *Recommended Ruling Concerning Slur and Graffiti Policy,* dated October 28, 1997 (approved and adopted August 28, 1998 (Arterton, J.)) [Docs. #858–1, 903]. The Special Master instructed the Department to include separate definitions of key terms and to determine whether the Office of Internal Affairs ("OIA") could and should investigate all complaints of policy violations. *Id.*

Eighteen months later, after repeated requests for the revised slur and harassment policy, the Department submitted a "new policy" in April 1999 that did not contain *any* of the changes outlined in the Special Master's 1997 ruling. At a hearing in June 1999, the Department provided what it again characterized as two "new" policies: one concerning racial, ethnic or sexist slurs or graffiti, and the second concerning harassment. Again those policies were woefully deficient and essentially identical to earlier submissions.

In June 1999, the Equal Employment Opportunity Commission (EEOC) issued "Enforcement Guidance," describing in detail elements that must be included in an anti-harassment policy and complaint procedure. Therefore, on July 8, 1999, the Special Master recommended disapproval of the revised policies submitted by the Department in June, both be-cause they did not correct deficiencies identified by the Court in earlier rulings, and because they did not conform with EEOC's "Enforcement Guidance." *Recommended Ruling Re: Slur and Harassment Policies,* dated July 8, 1999 (approved and adopted on August 16, 1999 (Arterton, J.)) [Doc. # 979]. The Court ordered that the defendants' *"final* revisions shall be filed with the Court, in compliance with EEOC Guideline, not later than September 10, 1999." *Endorsement Order,* dated August 16, 1999 (Arterton, J.). [Doc. # 989].

The Department revised the policies and resubmitted the three policies now at issue: (1) Sexual Harassment in the Workplace; (2) Threats, Intimidation and Harassment; and (3) Racial Ethnic or Sexist Slurs and/or Graffiti. On December 20, 1999, the Special Master recommended approval of the policies, with noted corrections and additions. Observing that all three policies provided for training of supervisors as mandated by Connecticut regulations,[1] and for annual distribution to each employee, with employees signing forms to acknowledge receipt of the policies, the Special Master instructed the Department to distribute the policies and begin training sessions once the policies were corrected. *Recommended Ruling Re: Slur and Harassment Policies,* dated December 20, 1999 (approved and adopted on June 6, 2001 (Arterton, J.)). [Doc. # 1015].

The Department admits that for nearly three years, between June 6, 2001, when the Recommended Ruling was approved and adopted, and April 7, 2004, the date of the hearing on this issue before the Special Master, "the required implementation of policies did not occur . . . ." Objection at 3.

---

1. *See* Conn. Agencies Regs. § 46a–54–204. *See also* Conn. Gen.Stat. § 46a–54. [Footnote in original].

The Department represents that "[a]s of April 30, 2004, the retraining of 420 of 442 Police Officers had occurred .... Training for the twenty two (22) officers who are on extended sick leaves will commence the week each one returns to work on an individual basis." *Id.* The Department further argues that its failure to implement the policies was an "unintentional, inadvertent and harmless error in that it did not result in any discrimination within the Department." *Id.*

## II. Discussion

■ In the face of the BPD's pattern of disregard for court orders concerning the slur and harassment policy between 1986 and the present, as recited above, the Court does not credit the BPD's claim that its noncompliance was merely "unintentional" or "inadvertent." [2]

The BPD's continuing noncompliance relates to the heart of the civil rights violations found by Judge Daly in his 1982 post-trial opinion: "The evidence introduced at trial indicates that racial slurs and disparaging remarks directed against blacks, as well as racial harassment of black officers are frequent occurrences in the B.P.D., and that they are not only tolerated, but engaged in by supervisory personnel as well as the rank and file, including the head of the department.... The evidence thus indicates a pattern of racially insulting and humiliating behavior which apparently has been condoned by supervisory officers.... This constitutes discrimination in the 'terms, conditions, and privileges' of black officers' employment, and consequently, a violation of Title VII of the 1964 Civil Rights Act." *Bridgeport Guardians v.*

*Delmonte,* 553 F.Supp. 601, 614–15 (D.Conn.1982). In 1983, Judge Daly empowered the Special Master to "[r]eceive, investigate, and remedy all complaints of discriminatory treatment, racial harassment or slurs within the B.P.D. and, in appropriate cases, to bring disciplinary charges against those responsible and/or those supervisors who foster or permit such racial harassment to occur in violation of departmental rules." *Id.* at 619. The BPD was well aware of its responsibility to remedy and prevent a recurrence of the hostility and harassment found to exist in the Department twenty-two years ago but obviously came to assign little priority to fulfilling it, even in the face of court orders.

■ "A court's inherent power to hold a party in civil contempt may be exercised only when (1) the order the party allegedly failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply." *N.Y. State Nat'l Org. for Women v. Terry (Terry I ),* 886 F.2d 1339, 1351 (2d Cir.1989). Here, the series of orders issued between 1983 and 1999 were clear and unambiguous, and BPD makes no claim to the contrary. Given the Department's admission that they understood their duty under those orders to create, enforce, and disseminate policies concerning racist, ethnic and sexist slurs and harassment, but that they made little or no effort to fulfill their obligations between 2001 and 2004, a finding of civil contempt of court is warranted, and it is so found.

---

2. The BPD's view that there was no ill result from its noncompliance also appears undermined by the CCHRO complaint of Deputy Chief Karen Krasicky, which alleges repeated discriminatory treatment and sexual harassment by the then-Chief of Police from 2000 through 2004. *See Recommended Ruling Re: Deputy Chief Karen Krasicky and Enforcement of Slur and Harassment Policies* [Doc. # 1356] (approved and adopted April 21, 2005 [Doc. # 1366]).

The remaining question ·is the sanction to be imposed. A criminal contempt sanction is "imposed to punish for an offense against the public and to vindicate the authority of the court...," and it only may be imposed after a jury trial. *N.Y. State Nat'l Org. for Women v. Terry (Terry V )*, 159 F.3d 86, 93 (2d Cir.1998). A civil contempt sanction serves two purposes: compensation for the effects of prior wrongdoing, and coercion of future compliance. *United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) ("Most [civil] contempt sanctions, like most criminal punishments, to some extent punish a prior offense as well as coerce an offender's future obedience."). The hallmark of civil contempt is that the defendant must have an opportunity to purge the contempt. *Id.* at 829, 114 S.Ct. 2552 ("Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge.").

When determining the nature or amount of a civil contempt sanction, a district court "is obliged to use the least possible power adequate to the end proposed." *Spallone v. United States*, 493 U.S. 265, 276, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990). The court "should consider (1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden." *Terry I*, 886 F.2d at 1353 (citing *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir. 1987)).

The need for an effective sanction is readily evident from the defendant's contumacy on the very important subject matter at the heart of the Remedy Order—racial slurs and harassment—and the absence of efforts to comply for almost three years.

This conclusion is underscored by the record of past situations in which defendants have otherwise disregarded the authority of the Court to implement its Remedy Order. On September 27, 2001, the Court found the Board of Police Commissioners in contempt for failure to follow clear ·directives in reporting and resolving disciplinary matters within the Department. *See* Endorsement Order [Doc. # 1146]. In December 2001, the BPD was fined $39,500 ($250/day) for failure to comply with the Court's ruling on investigation of disciplinary incidents. *See Recommended Ruling Re: Investigation of Discipline,* dated Dec. 10, 2001 [Doc. # 1156] (approved and adopted with modifications, Dec. 27, 2001 [Doc. # 1160] ). On January 14, 2004, the Court again found the BPD in contempt for failing to provide reports required by the "Stipulated Amendment to Remedy Order: Rotations," dated May 31, 2001. Endorsement Order [Doc. # 1256]. These prior contempt findings and sanctions were apparently inadequate to impress on the Department's officials that serious attention to compliance with court orders implementing the Remedy Order is required.

Although the Department represents that it has now initiated training on the revised policies and has re-trained the active officers, the Department's repeated contempt suggests a likelihood of continued future noncompliance of some sort, undermining the goal of institutionalizing non-discrimination in employment at the Bridgeport Police Department. While logic would dictate that avoidance of burdensome financial sanctions would impel municipal officials to give punctilious attention to court remedy orders, if only to protect scarce budgetary resources, the pattern of inattention and inaction by the BPD belies this logic. At a time when the Court has made clear its objective of stepping out of its prolonged role of overseeing BPD oper-

ations, the BPD's unwillingness to implement even the most basic changes to the slur and harassment policies demonstrates why expenditure of judicial resources will continue to be required to enforce the remedies ordered 22 years ago.

As ordered at the April 27, 2005 hearing, the Special Master is to take further evidence concerning the magnitude of the financial sanction to be imposed. In addition, as specified in the Recommended Ruling,[3] within 30 days of the date of this ruling, the Compliance Officer shall submit a written report to the Court certifying that all employees have acknowledged receipt of the three current policies and any amendments, and that the current policies are posted in prominent places as provided in the policies. The report shall also contain a certification that all current supervisors have received training satisfying both the policies and the requirements of Conn. Agencies Regs. § 46a–54–204. Notwithstanding the provisions of Conn. Agencies Regs. § 46a–54–206,[4] the trainers shall be qualified independent trainers not employed by the BPD. No later than January 31, 2006, and on or before January 31 for each year thereafter, the Department shall submit a report including: (1) the names of all current supervisors; (2) the dates they became supervisors; (3) the dates they received training and retraining under applicable state and federal regulations on the three slur and harassment policies; (4) the dates training is planned for the ensuing year; and (5) a certification that all employees were given the current policies and amendments in the applicable year.

 If any of these reports is materially inaccurate, incomplete or is untimely without extreme good cause, the Department and responsible city officials[5] will be assessed $1000/day.

## III. Conclusion

Accordingly, the Bridgeport Police Department is found to be in civil contempt for noncompliance with court orders concerning its slur and harassment policies, and this matter is remanded to the Special Master for further proceedings concerning the sanction to be assessed.

IT IS SO ORDERED.

---

3. The BPD does not object to this portion of the Recommended Ruling. *See* Objection at 4.

4. "An employer required to provide training by these regulations may utilize individuals employed by the employer or other persons who agree to provide the required training, with or without reimbursement." Conn. Agencies Regs. § 46a–54–206.

5. Although the city officials bearing responsibility for current BPD operations were not named as defendants in the original 1978 lawsuit, a non-party "who knowingly assists a defendant in violating an injunction" or who is "legally identified with" a defendant who violates an injunction "subjects himself to civil as well as criminal proceedings for contempt." *Backo v. Local 281, United Bhd. of Carpenters*, 438 F.2d 176, 180–181 (2d Cir. 1970), quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir.1930). Under the Federal Rules of Civil Procedure, injunctions and equitable relief such as the 1983 Remedy Order in this case are binding on the parties as well as "their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them..." Fed.R.Civ.P. 65(d); *see also Elec. Workers Pension Trust Fund v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 381 (6th Cir.2003), *Chicago Truck Drivers v. Bhd. Labor Leasing*, 207 F.3d 500, 507 (8th Cir.2000). Thus "[i]t is well-settled that a court's contempt power extends to non-parties who have notice of the court's order and the responsibility to comply with it." *Chicago Truck Drivers*, 207 F.3d at 507.