**THE BRIDGEPORT GUARDIANS,**
**et al. Plaintiffs,**

v.

**Arthur J. DELMONTE,**
**et al., Defendants**

**No. CIV. 5:78CV175JBA.**

United States District Court,
D. Connecticut.

April 29, 2005.

Angela Carol Robinson, Antonio Ponvert, III, Joan C. Harrington, Michael P. Koskoff, Vincent M. Musto, H. Jeffrey Beck, Bridgeport, CT, Joel Thomas Faxon, New Haven, CT, William B. Barnes, Fairfield, CT, for Plaintiffs.

Richard Herlihy, Shelton, CT, pro se.

Thomas D. Flynn, Bridgeport, CT, pro se.

Arthur C. Laske, III, Mark T. Anastasi, Raymond B. Rubens, Melanie J. Howlett, Bridgeport, CT, John Patrick Bohannon, Jr., Fairfield, CT, Harry B. Elliott, Jr., Meriden, CT, Diane Benevides, Providence, RI, John J. Kelly, Jr., Orange, CT, for Defendants.

*RULING ON SPECIAL MASTER'S RECOMMENDED RULING RE: ROTATIONS [DOC. # 1292]*

ARTERTON, District Judge.

## I. Background

Rotations of assignments within the Bridgeport Police Department are required by the 1983 Remedy Order and the May 31, 2001 Stipulation, which modified "the procedure under which police officers are rotated through various geographic and specialized division assignments." Stipulation p. 2. The Stipulation recites that after a series of meetings, all parties, including the recently-joined police union and the non-party Hispanic Society, agreed to "changes to the rotations procedure." *Id.* The Stipulation was approved by the Special Master in his Recommended Ruling Re: Rotation Policy, dated June 21, 2001, and approved and adopted by this Court on August 28, 2001. *See* [Docs.# 1124, 1140].

Since approval of the 2001 Stipulation, however, the Bridgeport Police Department ("BPD" or "Department") has failed to abide by the reporting requirements of the Stipulation "concerning the manner in which the rotations have been carried out." Stipulation p. 7. The BPD was required to file specific reports tracking the assignments resulting from the rotations so the Special Master and, presumably, the BPD could insure that rotations fulfilled the fundamental purpose of the Remedy Order: to afford equal employment opportunities within the BPD. Notwithstanding the important purpose of the reports, the Department failed to file any rotation reports concerning the January 2002 rotation. *See* Order dated Jan. 14, 2004 [Doc. # 1256]; Recommended Ruling Re: Compliance with Stipulated Amendment to Remedy Order, Dec. 11, 2003, at 6 (approved and adopted Jan. 30, 2004). As the January 2004 rotation approached, complaints were filed by 14 members of the Tactical Narcotics Team (TNT), urging the Court to discontinue rotations so they could stay in TNT. Because the required reports concerning the 2004 rotation plan also had never been filed, the Court was prevented from evaluating the rotation plan to see if it should be continued, modified, or discontinued. Given the BPD's unexcused violation of a Court order, the BPD was held in contempt for failure to comply with the rotation plan and reporting requirements of the 2001 Stipulation. The 2004 rotation was thus stayed pending further order, to issue after hearings, which the Court directed the Special Master to hold. *See* Order dated Jan. 14, 2004 [Doc. # 1256].

These hearings were to cover three subjects: (1) establishing procedures to institutionalize future compliance with court orders; (2) recommending sanctions to be imposed for violation of court orders; and (3) reviewing the rotation reports submitted and any complaints connected with the reports and making recommendations on rotation orders. The Special Master held hearings on April 7, 2004.

The Special Master's Recommended Ruling Re: Rotations, dated May 14, 2004 [Doc. # 1292], addresses all three issues and recommends: (1) ratification of new compliance procedures implemented by the Department, (2) sanctions of $500/day for the previously untimely rotation reports, for a total of $430,000 in fines, and (3) renewed rotation of officers from patrol, TNT, and all specialized commands. The Court approves and adopts the recommendation approving the BPD's compliance procedures and expansion of the internal compliance officer's duties, and directs the status report ordered by the Special Master to be filed no later than May 18, 2005. Based on the hearings held before this Court on April 12 and 27, 2005, and for the reasons that follow, the Court also approves and adopts the rec-

ommended ruling that the stay of rotations be lifted and the system of mandatory rotations be applied to all specialized divisions of the BPD.

During the April 2005 hearings, Acting Chief Anthony Armeno told this Court that he was withdrawing his predecessor's blanket objection to rotations in the specialized units, and agreed to consider rotations in the specialized units, focusing on the costs and lengths of specialized training required for eligibility and other operational considerations. The union argued against rotations in specialized units as exceeding the scope of the remedy order and as undermining the seniority system of the collective bargaining agreement. The Court concludes that the Remedy Order and the 2001 Stipulation do not exempt rotations in the specialized units.

## II. Discussion

### A. The 1983 Ruling and Remedy Order

A central finding by Judge Daly in his opinion issued in 1982 was "that plaintiffs have established that defendants unlawfully and intentionally discriminated against black police officers on the basis of their race in assignments to the Specialized Divisions of the B.P.D. in violation of Title VI and VII of the 1964 Civil Rights Act." *Bridgeport Guardians v. Delmonte,* 553 F.Supp. 601, 609 (D.Conn.1982). Plaintiffs presented evidence that "[a]ll but one of the 33 black police officers in the B.P.D. [at the time were] assigned to patrol" and were not given access to the "specialized divisions which, in addition to being gener-

ally more prestigious and/or less stressful than Patrol, afford greater opportunities to gain experience and skills that contribute both to job satisfaction and to the possibility of advancement." *Id.* at 607. Judge Daly found that the Federal Office of Revenue Sharing (ORS) concluded in 1979 that defendants had violated antidiscrimination laws, "finding that minorities are underrepresented and underutilized in all divisions except the Patrol Division." *Id.* at 608.

The "Assignment to Specialized Divisions" section of the opinion identified those units that were prestigious, less stressful, and/or afforded greater job satisfaction or advancement opportunities: Tactical, Records, Booking, Police Athletic League, Special Services and Youth Bureau.[1] *Id.* at 607. At the April 27 hearing, the Union proffered the undisputed fact that the Traffic division also existed at the time of the order. The fact that it is not mentioned in the Remedy Order is of no consequence in this Court's view, and reflects only that Traffic was not identified as one of the desirable units closed to minority officers.

■ In the twenty-two years following the Remedy Order, the BPD has reorganized, expanded, renamed, and introduced many other "specialized divisions" or "specialized units," which, by the BPD's representation, now encompass one-third of its police officers.[2] The BPD and the Union maintain that these post-Remedy Order specialized units are not within the scope of the Remedy Order and were exempted

---

1. The Connecticut Department of Labor had ruled that only supervisory personnel could work in Special Services and the Youth Bureau. *Bridgeport Guardians,* 553 F.Supp. at 607.

2. The witnesses at the April 12 and 27 hearings differed on what "specialized unit"

meant and which "units" should properly be denominated as such. The term generally was used broadly to describe any collection of officers whose duties require more than basic patrol training to perform some particularized service.

by the 2001 Stipulation. The Court disagrees.

The 1983 Remedy Order directed that: 1. At least fourteen black police officers shall be appointed immediately to positions in the Tactical, booking and Records Units and in the Police Athletic League, and such assignments shall continue for at least twelve months.

. . . . .

3. Defendants shall at all times maintain assignments of black officers to positions in the specialized divisions of the Bridgeport Police Department ("B.P.D.") specified in ¶ 1 on all shifts such that the percentage of black officers so assigned is at least equal to the percentage of black officers in the department. Additionally, defendants shall, within 90 days of the date of this Order, establish a rotation system pursuant to which all patrol officers who desire such assignments will have equal access to assignments in the specialized divisions regardless of race, color, sex, religion, or nationality. Any rotation system shall be subject to the Court's approval and shall insure that the percentage of black officers assigned to the specialized divisions is at all times at least equal to the percentage of black officers in the department.

*Id.* at 618–19. The terms of the Remedy Order do not exempt any specialized units. The goal of the rotation system was to achieve racial parity in the select units such that they, too, would reflect the racial composition of the BPD as a whole. The Department parses the language of the order stating that all officers "who *desire* such assignments will have equal access to assignments in the specialized divisions regardless of race . . . ," *id.* at 618 (emphasis added), as meaning that if there were no requests or volunteers, no rotation was mandated. The Remedy Order nowhere states that rotation into a specialized unit is contingent on an application from an officer. Rather, the percentage of minorities and women in the specialized units was to be, *at a minimum*, the same percentage as in the department overall, but no minority or female officer who desired a specialized assignment was to be prevented from rotating into a specialized unit just because the minimum percentage already had been achieved.

## B. May 31, 2001 Stipulation

▮ The BPD argues that the particulars of how the Tactical Division rotation would operate, as specified in the 2001 Stipulation, "expressly exempted" all other specialized units except TNT from rotation. The Court disagrees. The purpose of the Stipulation was to amend certain rotation procedures, and it did so for TNT (the successor to the Tactical Division), Community Policing, and the subsequently civilianized Records and Booking units "in the event that police officers are re-assigned to them." Stipulation p. 2. The Stipulation expressly provides that "[e]xcept as set forth herein, the rotations provisions of the Remedy Order and of all subsequent Court orders shall remain unchanged." *Id.* ¶ 1. Since the 1983 Remedy Order required rotation to achieve racial balance, including in desirable specialized, non-supervisory units, this requirement remains in effect and applies to subsequently formed special units. To hold otherwise would subvert the very purpose of the rotation requirement by excluding from the remedial goal of equal opportunity the specialized units which have proliferated since 1983. Since nearly one-third of the BPD's officers currently are assigned to specialized units, and minority officers are not uniformly proportionally represented in these units, to exempt most specialized units from rotation would permit repetition of patterns of exclusion—intentionally or

unintentionally—which the Remedy Order sought to eradicate.

## C. Necessity of Rotations to Address Discrimination

█ Even though the BPD is currently comprised of 47% minority officers, of whom approximately 16% are African American, and 53% Caucasian officers, many of the specialized units fail to reflect the racial or ethnic composition of the Department. The BPD's exhibits and testimony showed that there are no African–American officers in the Motorcycle unit, and only one each in the K–9, Mounted, Traffic, and Computer Aided Dispatch units. *See* BPD Exs. 17, 20. Only four out of twenty-six officers in TNT are African–American, while eight are Hispanic. *Id.* Therefore it is evident that remedial rotations are still necessary to provide department-wide equality of access to all BPD officers.

## D. Collective Bargaining Agreement

█ The Bridgeport Police Union objects that the recommended rotations will violate the seniority provisions of the applicable Collective Bargaining Agreement. The Agreement states in relevant part:

*Section 5* -

(A) All employees currently assigned to specific divisions shall remain in said assignments unless removed for just cause. Any future vacancy shall be filled, as described below within the classification applicable to the vacant position, and subject to the needs of the department....

(B) The divisions for which Police Officers on active duty may bid on a seniority basis are Patrol, Traffic, K–9, Tactical (TNT), and the Communications Center, which includes the front lobby desk....

(C) The ... Patrolm[e]n on active duty shall bid, based upon departmental seniority, for all of said divisions above, (sergeants shall also bid for the Record Room) as vacancies occur and the department's desire [sic] to fill said vacancies with the equivalent classification.

Agreement between City of Bridgeport and Bridgeport Police Local 1159, 7/1/01–6/30/04, at 37–38.

The above-quoted portion is identical in all relevant respects to the previous Agreements in effect between July 1, 1985 and June 30, 2001, *see* Union Exs. 6–10, and throughout the time the rotation system has been in place. Moreover, the Union participated in negotiations and agreed to the 2001 Stipulation, which expressly provides procedures for rotation in TNT, Community Policing, and "specialized divisions which were the subject of rotation requirements ... but which have since been civilianized." Stipulation at 2.

Acting Chief Armeno testified at the April 12 hearing that the rotation and seniority bidding systems currently coexist in specialized divisions that rotate: once the minimum number of slots is filled based on the rotation plan, the remaining vacancies are available for seniority bidding. No reason has been offered why an accommodation between a rotation system and a seniority system could not be implemented for the other specialized divisions.[3] The Court therefore is unpersuaded by the Union's argument that the recommended rotations would be incompatible with the seniority rights of its members.

---

**3.** The Court notes that the evidence at the April hearings demonstrated the potential disparate impact on minority officers that could result from sole reliance on a seniority system for assignment to specialized units. *See* BPD Ex. 23 (table of seniority of BPD officers by race.)

### III. Conclusion and Order

Accordingly, it is ordered as follows:

1. The stay of rotations entered on January 14, 2004 [Doc. # 1256] is lifted.

2. The Bridgeport Police Department shall implement rotations of all non-supervisory personnel, including specialized units such as: TNT, Community Policing, Mounted Police, K–9, Traffic, Motorcycle, Training, Housing Authority, Marine, and Emergency Services. Rotations shall be in accordance with a plan submitted to and approved by the Special Master and the Court.

3. The Chief of Police shall submit a proposed rotation plan for 2005–2006 in accordance with this order to the Special Master by **June 30, 2005.** The proposal shall include proposed lengths of rotations through each specialized unit and a narrative description of all specialized divisions and the training required for such assignments. If any rotations in such assignments are proposed to be longer than two years, justifications must be given. The Chief of Police is encouraged, but not required, to assemble a representative task force to assist him in developing this proposed rotation plan. The Special Master may hold a hearing on the proposed rotation plan as he deems necessary.

4. **Fines of $1000/day will be imposed for late filing.** The Chief of Police is to personally insure the Department's compliance with this order, on risk of contempt for noncompliance.

5. **Rotations shall begin no later than Sunday, October 2, 2005.**

6. If eligibility for specialized unit assignments requires special training, the Department should rotate those assignments among qualified officers until new officers are trained. The Department shall conduct training sessions with sufficient frequency that patrol officers can readily obtain the necessary training.

7. If the Department seeks to exempt any officer from rotation under the plan, it must file a motion with the Special Master seeking the exemption and setting forth the reasons therefor. The rotation plan may include only those exemptions specifically approved by the special Master.

8. The Department shall submit rotation status reports containing the information and in the format required by § III.C.2 (pgs.16–17) of the *Recommended Ruling Re: Rotations* dated May 14, 2004. Rotation status reports shall be filed with the Special Master on **November 1, 2005,** and **June 1, 2006.** These rotation status reports shall include: (1) the manner in which the rotations were carried out; (2) a chart detailing any changes of assignment since the rotation took place; and (3) any complaints received. In addition, the report due June 1, 2006 shall describe the proposed assignments for the rotation of October 2006. Future reports and/or additional information will be submitted to the Special Master as necessary.

9. The Special Master will hold hearings on the proposed rotation for 2006–2007 after review of the reports filed on June 1, 2006.

10. That portion of the Recommended Ruling concerning sanctions to be imposed for previous late rotation reports remains under advisement to afford the BPD the opportunity to supplement its record before the Special Master concerning its financial resources and the impact of the recommended sanctions on the contemnor BPD.

IT IS SO ORDERED.